The City of South Bend *et al. v.* Lewis.

The judgment is affirmed.

Filed April 25, 1894; petition for a rehearing overruled Sept. 21, '94.

No. 17,173.

The City of South Bend et al. *v.* Lewis.

Election.—*For Adoption of Proposed Measure.—Majority.—Failure to Vote.—Acquiescence.*—Where a measure is proposed to the people, and its adoption made to depend on a vote of the majority, those who do not vote are considered as acquiescing in the result declared by those who do vote, even though those voting constitute a minority of those entitled to vote.

Same.— *When Majority of all Votes Required.—Regular Election.*—Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at "such election," a majority of all the votes cast at the election is meant,

and not merely a majority of the votes cast on that particular question.

SAME.—*When Less than a Majority of all Votes Sufficient.*—Where, at a general election, a proposition is submitted to the voters, the result of the vote on the proposition will be determined by the votes cast for and against it, in the absence of a provision in the law, under which it is submitted, to the contrary.

SAME.—*Votes Upon Particular Proposition.—What Required.*—Where a legislative body provides that a proposition shall be submitted to the voters, that those in favor of the proposition shall cast an affirmative vote, and that those electors opposed to the proposition shall cast a negative vote, and that a "majority of the votes given" shall be requisite to the adoption of the proposed measure, then the only votes to be counted and considered in determining whether the measure is adopted or not are those which are given on the particular question involved.

SAME.—*Union of City and Town.—Election Upon.—Vote Required.— Statute Construed.*—The act of February 16, 1857, for the union of cities and towns, being sections 3233 *et seq.*, R. S. 1881, requiring the votes of a majority of the qualified voters of each corporation, at a special election held on a day to be fixed by the city and town authorities for the purpose of determining the matter, the result of which is to be specially canvassed and declared, only contemplates a majority of the persons voting upon the proposition for union, and the fact that the day fixed for the election is the day upon which the general municipal election is required by law to be held, and that the votes cast in favor of' such proposition do not constitute a majority of the votes cast for municipal officers, does not affect the result.

From the St. Joseph Circuit Court.

*J. G. Orr* and *A. Anderson,* for appellants.

*L. Hubbard,* for appellee.

DAILEY, J.—This was an action for injunction brought by Mary C. Lewis, appellee, against the City of South Bend and the Town of Myler et al., in order to contest the validity of proceedings for the annexation of the Town of Myler to the City of South Bend. It is claimed by the appellee that the proceedings for annexation are defective in this, that the proposition to annex the Town of Myler to the

City of South Bend was not voted for by a requisite majority of the voters of the City of South Bend. The facts were found specially by the judge of the circuit court, and the only error assigned is that the court erred in its conclusions of law.

The questions involved in this case have arisen under the act of February 16, 1857, for the union of cities and towns, being sections 3233 to 3242, Revised Statutes of 1881.

Section 1, of said act, provides that where an incorporated town and incorporated city adjoin each other they may be consolidated or united, provided a "majority of the qualified voters of the town and a majority of the qualified voters of the city shall vote in favor thereof, at elections to be held as hereinafter provided."

Section 2 provides for an agreement between the common council of the city and the trustees of the town as to the terms and conditions of the union, etc., and as to the day upon which "an election shall be held for the people of such town and city to vote upon the question" of such union, etc.

Section 3 provides for the publishing of said agreement for three weeks before "such election," etc.

Section 4 provides that "the election above provided for" shall be held at the time agreed on, at the same place where elections are usually held, and shall be governed by the same laws, etc.

Section 5 prescribes the form of ballots to be used, requiring those who vote in favor of the proposition to have the word "Union" on their tickets; those against, the words "No Union," etc.

Section 6 is as follows: "The inspectors and judges of the election shall report to the common council, and president and trustees, respectively, the result of such election. And the report of the inspectors and judges

of the town election shall be entered on the records of the president and trustees, and a certified copy thereof delivered to the clerk of the city; and the report of the inspectors and judges of the city election shall be entered on the records of the common council, and a certified copy thereof delivered to the clerk of the town. And if a majority of the votes given in the town as well as a majority of the votes given in the city are in favor of union or annexation, then the president and trustees and the common council shall meet at the council chamber of the city council, and, by resolution, declare that the town is annexed to the city, or the two united, as the case may be, according to the agreement aforesaid. And such resolution shall be entered on the records of the city council, and such record, and certified copies thereof, shall be conclusive evidence of such union or annexation, and a copy of such resolution shall also be recorded in the recorder's office of the county where such city is situated, and copies of such record shall be good evidence in all courts.''

The facts in this case are set forth in the special findings, and are briefly as follows: The town of Myler was a suburb of the City of South Bend, and on the 31st day of March, 1892, the common council of the city of South Bend and the president and board of trustees of the Town of Myler agreed upon the terms of union of said town to said city. The day agreed upon for an election was May 3, 1892, the day of the general city election in said city. The preliminary steps were all taken, and the law was fully complied with.

At the election held on May 3d in the city, 1,750 votes were cast in favor of the said proposition, and 237 votes were cast against the same. In the town 39 votes were cast in favor of the proposition, and 6 votes against it.

The total number of votes cast for candidates at the city election was over 5,000.

On the 9th day of May, 1892, at a joint meeting of the trustees of the said Town of Myler, and the common council of the said city, in the council chamber of the said City of South Bend, a resolution was adopted declaring that the Town of Myler had been annexed to the City of South Bend.

On the 7th day of December, 1892, the appellee filed her complaint in the St. Joseph Circuit Court on behalf of herself and all of the other property owners in the Town of Myler, to declare said annexation proceedings void, and to enjoin the collection of city taxes. The only question presented in this case is, whether the proposition for annexation requires a majority of the votes cast for and against the particular proposition, or whether it requires an affirmative vote of a majority of all persons who voted for candidates at the city election held at the same time.

It is now well settled, both in England and in this country, that when an election is to be held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those who absent themselves from such election or those who, though present, abstain from voting, are considered as acquiescing in the result declared by those who do vote, even though those voting may constitute a minority of those entitled to vote. McCrary Elections, section 173. *People, ex rel.*, v. *Warfield*, 20 Ill. 160; *Gillespie* v. *Palmer*, 20 Wis. 572; *Louisville, etc., R. R. Co.* v. *County Court of Davidson*, 1 Sneed 637 (692); Angell & Ames Corp. (9th ed.), sections 499-500; *St. Joseph Tp.* v. *Rogers*, 16 Wall. 644; *County of Cass* v. *Johnston*, 95 U. S. 360 (369); *Board of Supervisors Carroll County* v. *Smith*, 4 Sup. Ct. Reporter, 539.

A careful examination of the cases will show that in every case the decision rests upon the construction placed upon the statutes under which the election is held. The statutes of the several States are different on the subject. of elections. In some States the statutes require a "majority of the votes;" others "a majority of the voters voting," etc.

The case of the *Board of Supervisors Carroll County* v. *Smith, supra,* arose upon the construction to be placed on the words "two-thirds of the voters," in the constitution of Mississippi. The act referred to required the question of subscription or no subscription, to be submitted to the decision of the qualified voters of the county, city, or town, and if "two-thirds of the qualified voters" be in favor of the subscription the authorities are authorized to subscribe, etc. There were, on the day of election, 3,129 registered voters in the county, but only 1,280 of the voters voted at the election, of whom 918 voted in favor, and 362 against the proposition. The court said, on page 544: "The assent of two-thirds of the qualified voters of the county, at an election lawfully held for that purpose, to a proposed issue of municipal bonds, intended by that instrument, meant the vote of two-thirds of the qualified voters present, and voting at such election in its favor, as determined by the official return of the result. The words 'qualified voters' as used in the constitution must be taken * not those qualified and entitled to vote, but those qualified and actually voting. In that connection a voter is one who votes, not one who, although qualified to vote, does not vote."

When a question or an election is put to the people, and is made to depend upon the vote of a majority, there can be no other test of the number entitled to vote but the ballot. If, in fact, there be some or many who do

not attend and exercise the privilege of voting, it must be presumed that they concur with the majority who do attend, if indeed they can be known at all to have an existence. Certainly it would be competent for the legislators to prescribe a different rule; but when they simply refer a question to the decision of a majority of the "voters of a county," it can not be understood that they mean anything more than those who see fit to exercise the privilege. *Louisville, etc., R. R. Co.* v. *County Court of Davidson, supra*, 1 Sneed 637, 62 Am. Dec. 424 (452).

In *Southworth* v. *Palmyra, etc., R. R. Co.*, 2 Mich. 287, it is held that where a constitution requires that acts of incorporation shall have "the assent of at least two-thirds of each house," the word "house" means members present doing business—those forming a quorum—and not a majority of all the members elected.

In *St. Joseph Tp.* v. *Rogers, supra*, a statute of Illinois, by its 12th section, authorized any township along the line of a railroad named to subscribe to its stock.

But it was provided in the 13th section of the same act that no subscription should be made until notice had been given to the legal voters to meet for the purpose of voting on the matter: *Provided*, that where elections have already been held, and a majority of the legal voters of any township were in favor of a subscription, no further election should be necessary.

At an election held before the passage of this act, in St. Joseph township, only seventy-five persons voted, while in fact there were three hundred legal voters in that township.

Held, that a majority of those voting was sufficient to authorize a subscription, although all of the voters voting on both sides were together but a minority of the legal voters of the township.

It is equally well settled that where a question is required to be submitted at a general election, and a "majority of the voters" at "such election" is required to adopt the measure, that a majority of those voting at the election is required, and not merely a majority of those voting on the proposition. McCrary Elections, section 552; *State, ex rel.*, v. *County Com'rs*, 6 Neb. 474; *People* v. *Brown*, 11 Ill. 478; *Enyart* v. *Trustees, etc.*, 25 Ohio St. 618; *Everett* v. *Smith*, 52 Minn. 53; *Bayard* v. *Klinge*, 16 Minn. 249.

The rule is clearly and forcibly stated by Chief Justice Ripley in the latter case. He says: "Hence considering that the constitution requires such law to be submitted to the electors at a general election, that the returns would show the actual number of persons present at such elections voting on any question; that as a general rule it is the duty of every elector to attend and vote at such general election, and that the law presumes that every citizen does his duty;" they (the court) hold that in the eye of the law those present and voting at such election, not on any question then submitted, but on any question then to be voted on, constitute the electors of the county in the sense in which article 2, section 18, of the constitution uses such words; that is to say, that body, the adoption by a majority of whom, of such law as is referred to, would be the adoption thereof by a majority of the electors of the county.

In *Enyart* v. *Trustees, etc.*, *supra*, a question was required to be determined by a "majority of the electors of the said township, at some regular election." The question was submitted at the presidential election. Held, that it required a majority of the votes cast for President and Vice-President.

In *People* v. *Brown*, *supra*, the constitution declared that the General Assembly may provide for township

organization whenever a "majority of the voters of such county, at any general election," shall so determine.

The Legislature passed such a law, but the fourth section of the, act provided that if it appears by the returns of said election that a majority of all votes cast for or against township organization should be in favor thereof, then such county should be subject to and be governed by the act. At the general election there were over six hundred votes cast, of which one hundred and fifty-three were in favor of, and one hundred and seven against, the proposition. It was held that the constitution required a majority of all votes cast at the general election, and that section 4 of the act was repugnant to the constitution and could not stand.

. It appears from an examination of these cases, that when an act of the legislative body provides that the votes of a majority of the voters of any subordinate corporation shall be requisite to the adoption of any measure, then the only question is, did the measure receive a majority of the votes of the, electors voting on the proposed measure; but when the act requires that the question shall be voted on at some general election and receive a majority of the votes cast at such election, then it must be voted for by a majority of all the electors taking part in such general election.

In the case under consideration there was no requirement that the question of annexation should be submitted at a general election, but it was left to the officers of the city and town to determine when the election shall be held. The forms of ballots to be used are prescribed and provision made for casting and counting the votes cast on the question of annexation alone. No votes, except those upon the subject, are mentioned or contemplated in the act, and the only election named is the one

which is to be agreed upon between the city and town authorities.

This appeal presents but one question for our consideration: Must a majority of the voters of both the city and the town vote in favor of annexation before it can be consummated, or is a majority of those in each place voting directly upon the proposition only required?

Section 3233, R. S. 1881 (Burns' Rev., 1894, section 4208), provides that: "Where an incorporated town and an incorporated city adjoin each other, they may be consolidated or united, or the town annexed to the city, provided a majority of the qualified voters of the town and a majority of the qualified voters of the city shall vote in favor thereof, at elections to be held as hereinafter provided."

Section 3238, R. S. 1881 (Burns' Rev., 1894, section 4213), provides that the inspectors and judges of each election shall report the "result of such election, * * and if a majority of the votes given in the town, as well as a majority of the votes given in the city, are in favor of the union or annexation," the authorities of the two corporations shall meet, and, by resolution, declare them annexed. The word "given" obviously refers to votes given on the question of annexation. It is very clear that there was no other election contemplated by the Legislature. The question was one which affected only the people in the particular vicinity, and fixing the day for the election is left to the convenience of the people therein.

In *State, exrel.,* v. *Babcock*, 22 N.W. Rep. 372, the question there involved was required to be submitted at the election of Senators and Representatives, and required a majority of the votes cast at such election to adopt it. The court held that the words "such election" referred to the election for Senators and Representatives. The

words "such election" in the statute under consideration just as plainly refer to the election spoken of in the preceding sections, viz.: The annexation of the town of Myler. The question then arises: Will the fact that the authorities of the districts affected saw proper to submit the subject to the voters on the day of a municipal election change the result of the election and have the effect of counting against the proposition the votes of those who attended and voted at the regular election, but who failed to vote on the question submitted at the special election? The intention of the Legislature is to be gathered from the language of the act, and every case necessarily involves and turns upon the construction of statute law.

In the case of *Board, etc.,* v. *Winkley,* 29 Kan. 36, where a proposition to allow a bounty for the growing and cultivation of hedges, was submitted to the voters under a statute, which provided that "If a majority of the votes cast are for the bounty they shall declare said law to be in full force and effect." The proposition was voted on the same day on which the general election for township officers was held, and did not receive a majority of the votes cast at the township election, although it did receive a majority of the votes cast for and against it. Counsel, therefore, contended that the proposition was defeated. It was held, however, that the electors who were present at the polls, at the called election, and while voting for township officers, did not vote upon the bounty proposition, were presumed to assent to the expressed will of the majority of those voting thereon.

In *State, ex rel.,* v. *Echols* (Kan.), 20 Pac. Rep. 523, an election was held to determine whether a county high school should be established, and the question was submitted at the general election of that year for county officers. It was found that 2,264 votes were cast upon the

proposition; 1,397 in favor of, and 867 against it, while there were 3,109 votes cast for county officers. The statute under which the election was held required the question to be submitted to the voters of the county at a general or special election, and provided that after the election the ballots on such question should be canvassed in the same manner as those for county officers, and if a majority of all the votes cast shall be in favor of establishing such school the county commissioners are required to provide therefor. It was held that a majority of the votes cast on the proposition was required.

In *Armour Bros., etc., Co.* v. *Board, etc.,* 41 Fed. Rep. 321, an election was held under the laws of Kansas, relating to the purchase of land for a poor farm, providing that the board of county commissioners shall have power to assess a tax, not exceeding $500, unless the amount of taxes to be assessed shall be submitted to a vote of the people at some general election, and the majority of all the votes cast at a poll opened for that purpose shall be in favor of such assessment. It was held sufficient if the proposition received a majority of all the votes cast on that particular question; that it was not necessary that it should receive a majority of all the votes cast at the election. The court further said that if, instead of saying "at a poll opened for that purpose" the words "at said election," had been used after the word "cast," it would have fairly expressed the meaning contended for by the defendant.

In *State, ex rel.,* v. *Barnes,* 55 N. W. Rep. 883, it appears that Congress, by an act approved February 22, 1889, known as the "Enabling Act," directed the people in what is now North Dakota, to elect delegates to a convention to formulate a constitution to be submitted to the qualified electors for their adoption, and provided for the submission, at the same time, of separate articles or ord-

inances, and required for their adoption a "majority of the legal votes cast." Article 20 of the constitution, known as the "Prohibition Article," was so submitted. The time and manner of electing State officers was left entirely to the convention. The convention provided for the election of all State officers at the time of the vote upon the adoption of the constitution. Article 20 received a majority of the votes cast upon the question of its adoption, but did not receive a majority of the votes cast for Governor. It was contended, therefore, that article 20 did not receive a majority of the "votes cast," but the court held that when Congress had spoken of "the votes cast," it had reference to those cast upon the particular objects which it had directed to be submitted to a vote of the qualified electors. Congress had no knowledge that any candidates for offices would be voted for at such election, and the manner of their election was left under the exclusive control of the constitutional convention. And, further, it was the vote upon the constitution and the articles, if any, separately submitted which was to be certified to the President. And if, by use of the words "majority of the votes cast," Congress meant votes cast upon any subject, other than those directed to be certified to the President, it would be impossible for that official ever to ascertain whether a constitution had been legally adopted, although, under the the act, the duty devolved upon him to determine that question at once.

In *Walker* v. *Oswald*, 11 Atl. Rep. (Md.) 711, section 7 of the act relating to the adoption of high license, provided that "the voters of said county, at the general election, shall determine, by ballot, whether the provision of this act shall go into effect in said county. Those favoring the act will cast their ballots with the words printed or written thereon, 'for high license law;' and

those opposing the act shall cast their ballots with the words printed or written thereon, 'against the high license law;' and it shall be the duty of the judges of' said election to make a full return of the ballots cast as aforesaid *, to the clerk * *, who, 'from the certified return shall immediately make proclamation as to the result of said election.' "

Section 8 provides that the act shall take effect "if the majority of the voters of said county shall determine, by their ballots, in favor of the high license law."

At the general election, the aggregate number of votes cast for the several candidates for Congress was 8,680. The number of votes cast "for the high license law" was 4,314, and the number "against the high license law" was 3,825. The clerk issued his proclamation declaring the result in favor of "high license law."

A saloon keeper applied for a license under the old law, and the clerk refused to grant it, unless the applicant should comply with the provisions of the "high license laws." He therefore filed his complaint asking for a writ of mandamus compelling the clerk to issue a license. The only question presented in the appeal, as stated by the judge who decided the case, is, "did the adoption of the act depend upon its receiving in its favor a majority of the votes cast at that election upon some other subject or subjects? or upon its receiving a majority of the votes cast specifically for or against adoption?"

And, further, the court said: "This objection to the adoption of the act is founded exclusively upon the construction which is sought to be placed upon the words of the eighth section, 'a majority of the voters of said county,' taken in connection with the evidence furnished by the vote in the congressional canvass, that there were more voters in the county than the number who voted upon this measure."

This brings up the exact question presented in this case. The only points of difference between this statute and ours is this: That in the Maryland statute the question was required to be submitted at the general election, but the judges of election were to make a full return of the ballot "cast as aforesaid." In our statute, no requirement exists for submitting the question at a general election, but the result must be declared from the "votes given." This makes the effect of these statutes the same on this point.

"In regard to a general election," says the court, "it is urged that the highest aggregate vote cast furnishes the evidence as to the number of the voters of the county. At a special election it is not improbable that only a minority of the voters, well known to be an unmistakable minority, may vote. This fact might be susceptible of proof,—might be in reality self-evident. Yet, in the latter instance, those who absent themselves from the polls, and those who, being present, abstain from voting, are regarded as assenting to the result declared by those who do vote. Upon what principle would it be incompetent to apply the same presumption to those who, though attending a general election and voting on other subjects, abstain from voting upon one particular matter like the act in question? The very concession that a minority may elect necessarily implies that there is a large number of voters who do not vote, of whom that minority is merely a fraction. Hence the admission that a majority of those entitled to vote did not vote, does not preclude the minority who actually do vote from determining the results by their ballots. * * *

"Recurring to the language of the act, it will be observed that the Legislature has with particularity provided the forms of the ballots, both for and against the high license law; and that it has prescribed that 'a full return of the

ballots cast as aforesaid,' that is cast for and against the act should be made by the judges of election to the clerk, and that the latter, 'upon the certified returns, shall immediately make a proclamation of the result of said election.' What possible reason was there for the Legislature making provision with such exactness for "a full return of the ballots cast,' both for and against the high license law, and for a proclamation by the clerk upon the certified returns, if it were not designed that exclusive reference to the votes cast on that subject should be had in determining whether the act did or did not become operative? It is perfectly manifest that the phrase, 'full returns of the ballots cast as aforesaid,' refers to the votes cast for and against the high license law, and to no other votes; and that the duty of the clerk to 'make proclamation as to the result of said election,' could only be performed by announcing the result as evidenced by the certified returns of the votes cast upon that subject. If, therefore, he was confined, in making his proclamation as to the result of the election, to the returns made to him of the votes cast for and against the adoption of this act, no votes cast at the same election for some other purpose can be considered, counted or resorted to in determining the question of the approval of this measure. Indeed, if the Legislature intended that the act should not become effective, unless the majority of all the voters of the county affirmatively voted for it, it is difficult to conjecture a reason for the insertion of the provision respecting the casting and counting of votes against the measure, because, upon the assumption that the construction contended for is correct, if the votes cast in favor of the act had not been equal to the majority of all the voters voting for some candidate or for some other measure at that election, the act would have failed to take effect, notwithstanding no votes

had been cast against it at all; and consequently it would have been wholly unnecessary to make any provision whatever for casting ballots against the adoption of the law. The proclamation which the clerk is directed to make is 'as to the result of said election;' that is, the election held upon this question. The eighth section of the act must be read in conjunction with the seventh section, which we have been considering, and, thus read, clearly means, not a majority of all the voters of the county voting upon some other subject, but a majority of all the voters of the county who vote upon this act. The contrary construction would place these two sections in antagonism, and would cause the eighth to render nugatory the provision of the seventh section.''

The case of *People, ex rel.*, v. *Wiant*, 48 Ill. 263, is distinguishable from the case at bar. It was an application for a mandamus to compel the county treasurer to remove his office to the town of Wheaton, which, it is averred, had been recently selected as the county seat of DuPage county. The act under which the election was held provided that if it should appear upon a canvass of the votes that ''a majority of the legal voters of the county had voted for removal to Wheaton, then that place should be the county seat.'' The election returns showed that more votes were cast for the election of a circuit judge than upon the question of the removal of the county seat, and while a majority cast upon the question of county seat removal was in favor thereof, yet there was not a majority of the entire votes cast, and the mandamus was refused.

There are two important points of difference between the Wiant case and the one presented by this appeal. In the former the certificate of the clerk as to the result of the election is not made conclusive, while in the latter, by the R. S. 1881, section 3238, Burns' Rev. 1894, sec-

tion 4213, the record of the resolution declaring the town and city united, it is declared, "shall be conclusive evidence of such union or annexation." In the former it is expressly provided that the result must show a "majority of the votes of the county" in favor of the measure. In this case the statute provides that the result of "such election" shall be declared from the votes given, and the only election contemplated is the one to determine the particular question. It seems that the learned judge in the court below considered the decision in *State* v. *Swift*, 69 Ind. 505, as decisive of this case. The question there involved related to the adoption or rejection of a certain constitutional amendment that had been submitted to the people for their approval. Particular stress is laid upon the importance of restricting the right to change the organic law. The court say on page 519: "The ratification of a constitutional amendment affects the rights of millions of people who are not electors and can not vote, and for an indefinite time, until the amendment shall be abrogated by the same power that made it. In such case the constitution requires a majority of all the electors to ratify the amendment. The principle of plurality, which might ratify a constitutional amendment, irrepealable by legislative action, binding the rights of two millions of people, for an indefinite period, by vote of two electors against the vote of one, when the whole number of votes cast were but three, is not only unconstitutional, but it is dangerous to human rights, and repugnant to the sense of mankind. As the adoption of a constitution is the considerate act of an entire people, and as it binds all departments of the government, and can not be repealed except by the same power that made it, its adoption should not be left to the vicissitudes of a meager plurality of votes, which the

accidents of a day might cast one way or the other."
The court declares there is no analogy between cases
cited by the appellee, wherein taxes are assessed on fran-
chises granted by a majority of electors, and the ratifi-
cation of a constitutional amendment; as the former
affects the rights of but few persons relative to the whole
number of the people, while the ratification of such
amendment affects the entire body.   On page 523, they
say there are very few cases, involving the ratification
of constitutional amendments, and that they "must
therefore rely upon the precedents and practices found
in the history of our own State."   From a careful ex-
amination of the opinion, it seems the court did not con-
sider the rule applicable in cases like the one now under
consideration, and relied wholly upon the construction
placed upon various sections and amendments of sections
of the constitution of this State as shown by the debates,
and the importance of restricting constitutional amend-
ments.   In the *State, ex rel.,* v. *Babcock, supra,* the ques-
tion there raised was as to the number of votes necessary
to adopt an amendment to the constitution.   It is there
said:  "Section 1, article 15, of the constitution, pro-
vides:   Either branch of the Legislature may pro-
pose amendments to the constitution, and if the same be
agreed [to] by three-fifths of the number elected to each
house, such proposed amendment shall be entered on the
journal, with the yeas and nays, and published once a
week in at least one newspaper in each county where a
newspaper is published, for three months immediately
preceding the next election of senators and representa-
tives, at which election the same shall be submitted to
the electors for approval or rejection; and if a majority
of the electors voting at such election adopts such amend-
ments, the same shall become a part of the constitu-
tion  *  *  *;"   and it is further said substantially:

At the election 134,000 votes were cast for governor, 132,000 for senators and representatives, 51,959 in favor of the proposed amendment, and 17,786 against it. It was held that the section required the majority of votes cast for senators and representatives. The decision rested on the construction to be given the constitutional provision under which it was held. It will be observed that the section quoted required the proposition to be submitted to voters at the election of senators and representatives, and provided ''if a majority of the voters at such election adopts such amendment, the same shall become a part of the constitution.'' The words ''voting at such election'' clearly meant those voting at the election of senators and representatives, and the court said: ''Those words were evidently intended as a restriction upon the right to change the fundamental law, and not permit a minority of the people of the State to incorporate new provisions therein.''

It is further said, on page 375, that ''The convention that framed the constitution doubtless presumed that if an amendment was necessary and really desired by the people, a majority would favor its adoption; hence, before an amendment can be submitted to the people, at least three-fifths of the members elected to each house must agree to the proposed amendment. It must then be submitted to the electors, * * and the submission must be at the election when Senators and Representatives are elected, and the majority of those voting at such election are required to vote in favor of the proposition to adopt the same. The words 'such election' evidently refers to the election for Senators and Representatives.''

In the opinion the court criticised the case of *State* v. *Swift, supra,* 69 Ind. 505, involving the same principle, stating that the election at which the proposed amendment was to be submitted was the township election, and the

question of amendment was the only one requiring a State canvass of the votes. And it would seem that the only criterion by which the vote of the State could be ascertained was the vote upon that question. It is also said the rule of construction, as applied to statutes and constitutions, is to "compare and consider the several parts of the section and to deduce therefrom the purpose and intent of the law givers. And, "in the absence of a statute or constitutional provision requiring a majority of all the votes cast to be in favor of a proposition, there is no doubt that a majority voting upon that question may be considered as tacit assent to the will of the majority voting thereon."

Applying such a rule of construction to the case of *State* v. *Swift*, *supra*, it would be difficult to reconcile it with the Nebraska case. It is, at least, evident to our minds that the rule declared by the court in *State* v. *Swift*, *supra*, should not be extended so as to embrace any litigation other than that arising on the question of amending the organic law of the State. From an examination of the authorities bearing upon the question, we deduce the following rule: If, from the language of the statute, it is intended that a special vote shall be cast upon a proposition, and the law does not expressly require the majority of the votes cast at the general or regular election to adopt the measure, then it matters not whether the votes are cast at the same poll as is used for the election of officers. All that is necessary, in such case, is that the measure should receive a majority of the votes cast for or against it, and they can be separated from the rest of the votes cast at such election and the result declared from the votes cast on the proposition. In the case of an election for officers, it frequently happens that a candidate for one office receives more votes than an aspirant for another office voted for on the same

ticket.   In such case each candidate is only required to receive a plurality or majority of the votes cast for his particular office, and those cast for a candidate for another office are not considered in determining such plurality or majority.   There can be no reason for a different rule of construction when a proposition is submitted at the same time.   A voter goes to the polls and examines his ticket concerning everybody and everything to be voted for; weighs the capabilities of the several candidates and the merits pro and con of the proposition, and then casts his ballot, voting separately for each candidate and on the proposition, according to his own judgment.   There is no reason why the highest number of votes cast for an office should be taken as the criterion when determining the result of a vote on a proposition any more than for the election of an officer. It is manifest, if such a rule were to apply to candidates in many cases, neither would receive a majority of the total number of votes cast and there would be no election.   As a result of applying such a rule, a proposed measure might be defeated, while the same number of votes cast in its favor would have secured the election of an officer.   The nature of the proposition might be such that it should not be passed thoughtlessly by, or left to the will of a few of the voters who should choose to vote upon the same at a regular election.   In such cases the Legislature could throw a safeguard around the measure by requiring it to be submitted at a regular election which would presumably call out all the electors, and by requiring it to receive a majority of all the "votes cast at such regular election."   In the absence of such requirement provided by the Legislature, there is neither principle nor authority for measuring the result by any other votes than those cast for or against it.

The learned counsel for the appellee seems to rely

upon the provision that a town and city may be united if a "majority of the qualified voters of the town and a majority of the qualified voters of the city" vote in favor thereof. If this section stood alone, it might be urged that a majority of all the voters are necessary, and the number of votes cast at the city election for officers should be taken as additional means for ascertaining the number of legal voters of the city. But the other sections of the act clearly show that such was not the intent of the framers of the act.

In the first place, section 1 limits the number of qualified voters to those voting "at an election to be held as hereafter provided."

Section 2 provides that the respective officers of the city and town shall agree upon the terms of such union or annexation "and also upon a day when an election shall be held for the people of such town and city to vote upon the question of union, consolidation or annexation, etc."

Section 3 provides that said agreement shall be published at least three weeks before the time agreed upon for "such election."

Section 4 provides that "the election above provided for" shall be held, etc.

Section 5 provides that those who vote in favor of union or annexation shall have on their tickets the word "Union," and those who vote against it shall have on their tickets the words "No Union."

Section 6 provides that the inspectors and judges of election in the town and city respectively shall report the result of "such election," which reports shall be entered on their respective records, and certified copies of these records mutually exchanged. Then the officers of the city and town meet, and if "a majority of the votes given" in the city and in the town are in favor of a union

or annexation, they shall by resolution declare them annexed, etc. This resolution shall be recorded, and such record shall be conclusive evidence of such union or annexation, etc.

Reading all these sections together, we are unable to think otherwise than that but one election was contemplated by the Legislature, and that the only votes to be counted or considered were those cast for or against the proposition. Sections 1 and 6 show that so far as that proposition was concerned the "voters of the city" were those who chose to cast their votes on it. By section 6 only the result of "such election" was to be reported. Not by any possible construction could it be said that the inspectors and judges were to return to the common council and board of trustees the votes cast upon other subjects or for candidates for office. They were to return the votes cast at "such election," which is described in section 2 as "an election held for the people of such town and city to vote upon the question of such union or annexation." From this report, then, must the common council and board of trustees determine the result of the election. The result, then, would depend entirely on the votes cast for and against the measure, and those voters who, for any reason, did not vote on the question at all would be bound by the result. They would be estopped from saying that the result was not the will of the majority. In order to make the matter plain and effectually prevent such voters from disputing the result, the Legislature has gone further, and expressly declared that the record of the resolution, based upon the "votes given" at "such election," shall be conclusive evidence of such annexation.

The result of the construction claimed by appellee would be to count against the measure all votes cast for city officers, which were not directed to this measure,

making it within the power of citizens to defeat the measure by simply ignoring it.

If such a construction is correct, there would be no necessity for providing, as the Legislature did, that when the question was submitted to a vote, votes should be cast for "no union;" for if the votes in favor of the union were not equal to a majority of all the votes cast for municipal officers, then the proposed union would be defeated. Why should the Legislature provide for a count of the votes against the union when, under the proposed construction, the result could be arrived at by simply ascertaining whether more than half of all the votes cast were in favor of it? It seems to us that this provision alone settles the question, and shows that the Legislature must have intended, in passing the act under consideration, that the votes in favor of the union should be first counted and then the votes against the union should be counted, and that the only question for the inspectors of the election to determine was whether the votes in favor exceeded the number of votes against the proposed measure.

From what we have said, we think it clearly appears that four leading principles may be considered as fully established, namely:

First. Where a measure is proposed to the people, and its adoption made to depend on a vote of the majority, those who do not vote are considered as acquiescing in the result declared by those who do vote, even though those voting constitute a minority of those entitled to vote.

Second. Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at "such election," a majority of all the votes cast at the election is meant, and

not merely a majority of the votes cast on that particular question.

Third. Where, at a general election, a proposition is submitted to the voters, the result of the vote on the proposition will be determined by the votes cast for and against it, in the absence of a provision in the law, under which it is submitted, to the contrary.

Fourth. Where a legislative body provides that a proposition shall be submitted to the voters; that those in favor of the proposition shall cast an affirmative vote, and that those electors opposed to the proposition shall cast a negative vote, and that a "majority of the votes given" shall be requisite to the adoption of the proposed measure, then the only votes to be counted and considered in determining whether the measure is adopted or not are those which are given on the particular question involved.

Of the correctness of these four principles we think there can be no dispute. The only doubts which can arise are those occasioned by a confusion of the second and third. Indeed it may be said that the first and third principles are identical, and control all such cases except such as are controlled by statute or constitutional law.

Thus, in *Oldknow* v. *Wainwright*, 2 Burrow, 1017, the rule was announced that those who absented themselves from the election were bound by the result declared by those actually voting. But that case went further, and declared that the same rule applied to those who were actually present and abstained from voting. The facts showed that nine voters voted, and also that eleven voters were present and failed to vote. Counsel for appellee contended that the votes cast at the regular election merely enabled us to ascertain the actual number of voters in the county, and are merely a matter of evidence. The court said:

What difference could it have made whether the eleven voters who did not vote were there protesting against an election, or were there for the purpose of voting upon some other subject? In either case the actual number of voters at the polls is shown, and the evidence furnished. The result depended upon the vote of the majority. The evidence showed, affirmatively, that a majority had failed to vote. Yet, with this positive evidence, the measure having received a majority of the votes given, the court considers those not voting as acquiescing in the result declared by those who did vote. It was the duty of the eleven men to vote, and when they failed or refused to perform that duty, and threw the burden of it upon the remaining nine, the decision of the latter prevailed. Their duty as voters is just the same, whether there are one or a dozen questions to be determined, and is the same as to each question. Could they then, burdened with this duty, go to the polls, vote upon one proposition, utterly ignore all the others, and then be afterward heard to object to the result declared on the other propositions by those who had used their judgment and expressed their will through the ballot?

If those who enacted the law did not deem the question of such vital importance to the community that it should require more than a majority of the votes cast for and against it, then the intent of the law and law-makers is carried out by measuring the result by the votes cast on the proposition. Guided by the rule that a citizen who, in omission of his plain duty, refrains from voting, is bound by the result declared by those who exercise their prerogative and controlled by the express provisions of the act, which provides that the inspectors and judges of the election shall report the result of "such election" at which the people were to "vote upon the question of union or annexation," and upon such

return the common council and board of trustees shall, by resolution, declare the result, and that such resolution shall be binding upon everybody.

We feel that the decision of the circuit court should be in all things reversed.

The judgment of the lower court is reversed, with instructions to hold the record of the resolution conclusive evidence of such union or annexation.

HOWARD, J., did not participate in this opinion.

Filed June 22, 1894.