## IN RE TODD.

[No. 26,513.   Filed January 29, 1935.   Rehearing denied April 12, 1935.]

*Note 2.*   Reports and Opinions Attorney General of Indiana, 1929-30, pp. 242, 244.

170

*Lemuel S. Todd,* for petitioner.

TREANOR, J.—The General Assembly of 1931 enacted the following:

"The Supreme Court of this state shall have exclusive jurisdiction to admit attorneys to practice law in all courts of the state under such rules and regulations as it may prescribe." Acts 1931, ch. 63, p. 150.

In July, 1931, this court adopted rules regulating admission to the practice of law in Indiana. Under these rules an applicant is required to take an examination to determine his professional fitness. Petitioner, Lemuel S. Todd, insists that under §21, Art. VII, of the Constitution of Indiana neither the General Assembly nor this court can require of applicants an examination for the purpose of testing professional fitness.

*Amici curiae,* representing the Indiana State Bar Association, suggests that the petition be dismissed, supporting their suggestion by brief. The position of *amici curiae* is in substance as follows:

1. The rules of this court, as to their substantive requirements, are valid, being a reasonable means of ascertaining the "good moral character" and residence of the applicant and consequently do not violate §21, Art. VII.

2. Section 21, Art. VII, of the Constitution of 1851-2 was stricken from the Constitution by amendment at the general election November 8, 1932.

If §21 of Art. VII of the Constitution of 1851-2 was stricken from the Constitution by amendment at the general election November 8, 1932, there can be no question about the power of this court to make and enforce the rules of which applicant complains. The vote upon the amendment in question was 439,949 for adoption and 236,613 against. Thus a majority of the voters who voted upon the amendment favored its adoption. But

the number of voters favoring its adoption was much less than half the number of voters who voted for political candidates at the general election. Consequently to hold that the amendment was adopted it would be necessary to overrule the cases of *State* v. *Swift*,[1] *In re Denny*,[2] and *In re Boswell*,[3] which have announced the rule that a proposed amendment which is submitted to the electors at a general election fails of adoption unless it is approved by a majority of all the voters who vote at the general election.

> When the overruling of previous decisions involves only a question of public interest in no way affecting private interests the rule of *stare decisis* does not control.

> "The case of *House* v. *Board, etc., supra,* and cases following, do not involve property rights, nor has the rule, which they declare, in any sense become a rule of property, or a basis for contracts. The overruling of those cases will not produce uncertainty in titles, or introduce doubt and confusion in questions of property or contracts. Under such circumstances, it is the duty of the court to correct its own errors, and the doctrine of *stare decisis* can not be successfully invoked to perpetuate them."[4]

And this is especially true when a constitutional question is involved. Consequently we feel no hesitancy in considering the merits of the constitutional question presented by amici curiae, and we feel freer to re-examine this question in view of the strong dissenting opinions in the cases of *State* v. *Swift* and *In re Denny*.[5]

The procedure which must be followed in order to

---

*Note 1.* (1880), 69 Ind. 505.
*Note 2.* (1901), 156 Ind. 104, 59 N. E. 359, 51 L. R. A. 722.
*Note 3.* (1913), 179 Ind. 292, 100 N. E. 833.
*Note 4.* *Board of Commissioners of Jasper County* v. *Allman* (1895), 142 Ind. 573, 594, 42 N. E. 206, 39 L. R. A. 58.
*Note 5.* See Ind. L. Jour., Vol. IX, No. 7, Apr. 1934, p. 403, for a critical discussion of *State* v. *Swift, In re Denny* and *In re Boswell.*

make a proposed amendment a part of the Constitution is clearly set out in Article XVI. At two sessions of the General Assembly it must be approved by "a majority of all the members elected to each house"; and it must then be submitted "to the electors of the state" and be ratified "by a majority of said electors." No one has questioned the obvious meaning of a "a majority of all the members elected to each house," but there has not been such unanimity as to the meaning of "a majority of said electors."

The first case to come before this court which involved Art. XVI was *State* v. *Swift, supra.* A proposed amendment had received the approval of a majority of the members elected to each of the two houses of the General Assembly in the sessions of 1877 and 1879 and was submitted to the electors of the state at the spring election of 1880, which was held to elect township officers. The pleadings reveal that the total number of votes cast in the counties for township officers was 380,471; and that the votes cast on the proposed amendment were 169,483 for and 152,251 against. By a three to two decision this court held that the proposed amendment had not been ratified. There is considerable diversity in the reasoning of the judges.

In the personal opinion of Biddle, J., "majority of the said electors" meant more than one-half of the electors of the state. But he concedes that it is impossible for a court to know the exact number of electors of the state; "for the number, on account of deaths and coming of age" is not the same any twenty-four hours. He finally rests upon "the practical meaning of the phrase 'all the electors of the state,'" which he defines as "that substantial number who vote at general state elections, and the number of whose votes is officially returned by sworn officers, into the office of the secretary of state." Apparently he would not recognize as

the number of electors of the state the total number voting at an election held specially to vote on amendments. And this is clear from the statements in the majority opinion respecting the Wabash and Erie canal amendment (Art. X, §7, Ind. Const.). This amendment was submitted at a special election in 1873 and was approved by an overwhelming majority of the votes cast at the election, and the governor proclaimed the amendment adopted in accordance with the provisions of the legislative act under which the submission took place. The submission act made no provision for a determination of the total number of qualified voters of the state; and the returns were made and the result declared on the basis of the votes cast for and against the amendment. The majority opinion in *State* v. *Swift* assumes that the Wabash and Erie canal amendment had become a part of the Constitution despite the fact that official records of which this court was required to take judicial notice failed to show that a majority of the qualified voters of the state had voted in favor of the amendment. Since the validity of the Wabash and Erie canal amendment was not before this court in the case of *State* v. *Swift* any reference thereto was merely dictum. But it is interesting to note that the opinion in *State* v. *Swift* declares that the amendment had become a part of the. Constitution as a result of legislative and executive action without regard to whether it had been approved by a majority of the qualified voters of the state. The court's reasoning is indicated by the following (p. 513) :

"In pursuance of this act, the Governor and Secretary of State declared the returns of the election, and the Governor issued his proclamation, declaring that the proposed amendment had received the requisite constitutional majority in its favor, necessary to its ratification, and had become a part of the Constitution of the State, as section 7 of article

10 thereof, which section is now printed by authority in the Constitution. The matter, therefore, having been decided and proclaimed, according to law, by the executive department, a co-ordinate branch of the government, has now become *res adjudicata.*"

This court again declared in *In re Denny, supra,* that "majority of said electors" meant more than half of the qualified electors of the state. The majority opinion assumes that "one would expect a provision that the charter of our liberties should stand unaltered until the sovereign majority, by affirmative action, expressed their desire for and effected a change," and then concludes (p. 108):

"And such is the clear letter and spirit of article 16. If a majority of the electors of the State shall ratify a proposed amendment, it shall become a part of the Constitution; otherwise not. There is no room for construction. The language is too plain to admit of quibbling. 'Majority' means 'more than half.' 'Electors,' with reference to an election, means, according to the lexicographers and universally accepted usage, 'persons possessed of the legal qualifications entitling them to vote.' The word 'voters,' on the other hand, has two meanings, 'persons who perform the act of voting' and 'persons who have the qualifications entitling them to vote.' Constitutions are drafted with care. The framers of our Constitution deliberately selected and used the words in the meaning of which there could be no ambiguity. The sentence, 'If more than half of the persons in the State who possess the legal qualifications entitling them to vote shall ratify the proposed amendment, it shall become a part of the Constitution,' is a cumbersome equivalent. The idea is clearly and more succinctly expressed in the wording of the Constitution. No other standard for the adoption of proposed constitutional amendments may be set up by this court, becomingly or lawfully, than the one fixed by the Constitution, the affirmative ratification by 'a majority of the electors of the State.' So, in any

case, the question becomes one, not of constitutional construction, but of evidence."

We readily agree that a majority means more than one-half; but we do not share the absolute conviction that "majority of said electors" means more than half of the qualified electors of the state as distinguished from more than half of the qualified electors who vote for and against a proposed amendment. The majority of this court in both *State* v. *Swift* and *In re Denny* assume that there is a definite policy against adopting an amendment to the Constitution by less than a majority of all the electors of the state. And in *In re Denny* the majority opinion expressly declares that one would expect a provision in the Constitution embodying such policy. At the time of the adoption of the present Constitution there was nothing in the federal or state Constitutions to suggest a constitutional policy of requiring the assent of a majority of all qualified electors in order to amend either Constitution. In fact there was no provision whatever in the first state Constitution which required proposed amendments to be submitted to the electors for ratification;⁶ and our first Constitution was adopted for the state by the convention which formulated it. Article VIII of Indiana's first Constitution authorized the General Assembly to submit to the electors of the state the proposition of calling a constitutional convention with power "to revise, amend, or change the Constitution." It also expressly required the proposal to be voted upon at a general election and specified that the proposal to call a convention must be approved by "a majority of all the votes given at such election." The delegates of a convention called under Art. VIII would be elected under the plurality rule and any amendments approved by a majority of the members of the convention would be-

*Note 6.* Article VIII, Indiana Constitution of 1816.

come a part of the Constitution without being referred to the electors of the state. By the terms of Art. VIII the people had the power to determine whether a convention should be called, but no power to accept or reject proposed amendments. Further, it is significant that Art. VIII definitely prescribes the group of electors the majority of which would determine whether a convention should be held. This is done by the following provisions:

(1) ". . . at the general election held for governor;
(2) there shall be a poll opened, in which the qualified electors of the state, shall express, by vote, whether they are in favor of calling a convention or not;
(3) and if there should be a majority of all the votes given at such election, in favor of a convention, . . ."

In short, Art. VIII of the Constitution of 1816 expressly provided that a proposal for a convention must be submitted to the people at a general election for governor and that for the proposal to be carried a majority of the votes cast at the election must be favorable. But this is a specific provision and is not an inference suggested by a general policy.

In view of the foregoing we are not justified in assuming that prior to 1851 there was any traditional constitutional policy which required the approval of a majority of all the electors of the state to amend the Constitution. There was simply an express constitutional requirement that no convention with "power to revise, amend or change the Constitution" could be called without the approval of a "majority of all the votes given" at a "general election held for governor." And as pointed out above, the action of the convention was final and binding upon the people of the state.

Further, an examination of the terms of the legisla-

tive act⁷ which provided the procedure for submission of the present Constitution to the people is significant. We quote the following:

"Sec. 2. There shall be a vote taken on the first Monday of August next on the adoption or rejection of said Constitution, . . . and for this purpose it shall be the duty of the inspectors and judges of elections in the several townships in this state, on said first Monday of August next, to open a poll, in which shall be entered all the votes given for and against the adoption of said Constitution and of said separate article. Said *election* (our italics) shall be by ballot, and shall be governed in all respects by the laws now in force in relation to general elections, so far as applicable.

"Sec. 3. Those voting against the adoption of said constitution shall vote written or printed tickets in this form: 'against the constitution,' and those voting for its adoption shall vote written or printed tickets in this form: 'for the constitution.'

"Sec. 4. Poll books shall be kept, votes counted, and certified to the clerks of the different counties as in other elections, and the returns of the votes for and against the adoption of said constitution, and for and against said separate article, shall be made by said clerks to the secretary of state within ten days after said election, and said returns shall, within twenty days thereafter, be examined and canvassed by the auditor, treasurer, and secretary of state or any two of them, in the presence of the governor and such other person as may choose to attend, and proclamation shall be made forthwith by the governor of the result of the election. If it shall appear that a majority of all the votes polled at such election were given in favor of the adoption of said constitution, it shall then become the constitution of the State of Indiana from the first day of November, 1851; but if it shall appear that a majority of all the votes polled for or against the adoption of said constitution and said separate article, were given against the adoption of said constitution, then the same shall be and remain inoperative and void. If it shall further appear that a

*Note 7.* General Laws, 1851, ch. XXIX, p. 53; 54.

majority of all the votes polled for or against the adoption of said constitution and said separate article were given in favor of the article in relation to the exclusion of negroes and mulattoes and their colonization, then said article shall be and form a part of said Constitution, otherwise said article shall be void."

The effect of §2, *supra,* was to authorize and require the "inspectors and judges of elections in the several townships in this state" to hold a special election to decide upon the adoption or rejection of the proposed Constitution and of the separate article. The voters in this special election were limited to those who voted for or against these proposals. This is shown by various provisions of the statute. The returns to be made to the secretary of state were of the "votes for and against the adoption of said Constitution and for and against said separate article;" and if a "majority of all the votes polled at such election" favored the adoption of the proposed constitution, it would "become the constitution of the State of Indiana"; or, stating the same thing negatively, if a "majority of all the votes polled for or against the adoption of said constitution and said separate article," should be "given against the adoption of said constitution" then "the same shall be and remain inoperative and void." It is clear that "all the votes polled at such election" must mean the same as "all the votes which were cast for or against the adoption of said constitution and for and against said separate article." This is emphasized by the provision relative to the vote on Article XIII,—which makes its approval conditioned upon its receiving a "majority of all the votes polled for or against the adoption of said Constitution and said separate article." And in accordance with the foregoing construction the returns were examined by a canvassing board and the governor's proclamation was issued declaring the proposed constitu-

tion adopted and Article XIII approved as part thereof.[8]

We know that the voters of Indiana voted at a political election on the first Monday of August, 1851; and that the "inspectors and judges of elections in the several townships in this state" conducted these elections as well as the election for the adoption or rejection of the proposed constitution. Yet the votes cast in the political election were not considered in determining whether a majority of all the votes were given in favor of the adoption of the present Constitution. In short, under the legislative act of submission the proposed Constitution became the present Constitution of Indiana because a majority of the votes polled for and against the adoption of the Constitution and separate article were given in favor of its adoption.

In view of the foregoing we are not justified in approaching the task of construing Art. XVI with the preconceived notion that it ought to include a specific provision that proposed constitutional amendments must be approved by a majority of all the qualified voters of the State before becoming a part of our Constitution. But it is apparent from a reading of the majority opinions in *In re Denny* and *State* v. *Swift* that such a precon-

---

*Note 8.* By his proclamation the Governor certified that in his presence the Auditor, Treasurer and Secretary of State "examined and canvassed all the returns made from the several counties of this state, of the votes polled for and against the New Constitution by the electors of this state on the first Monday of August, 1851, and that the whole number of votes polled 'for the Constitution' in the counties making returns, is 109,319. And the whole number of votes polled 'against the Constitution' is 26,755. Being a majority of 82,564 in favor of the Constitution." He further certified that the above named officers "canvassed all the returns . . . of the votes polled for and against the 13th Article of said Constitution, known as the Article entitled 'Negroes and Mulattoes,' and that the whole number of votes polled for 'exclusion and colonization of Negroes and Mulattoes' is 109,976 and that the whole number of votes polled against 'exclusion and colonization of Negroes and Mulattoes is 21,066, being a majority of 88,910 in favor of 'exclusion and colonization of Negroes and Mulatoes.' "

ceived notion definitely influenced the result in those cases.

We shall first examine the reasoning in the majority opinion in *State* v. *Swift*. We quote the following (p. 514):

"The above statement shows that, by the act of Congress, it required 'a majority of the whole number elected,' of the members of the convention, to decide upon the expediency of adopting the constitutionof 1816; and that, by the act of the Indiana Legislature, it required 'a majority of all the votes polled at such election' to adopt the constitution of 1851. It also appears that it required 'a majority of all the votes cast' to ratify article 13 of the constitution of 1851, which was submitted to the electors as a separate proposition; and that it requires 'a majority of the members elected to each of the two houses' of the General Assembly, at two successive regular sessions, to propose an amendment or amendments to the constitution, and, when so proposed, 'it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution.' And, by section 25 of Article 4 of the constitution, it requires 'A majority of all the members elected to each house' to pass a bill or joint resolution.

"We can find no authority, either in the constitution of 1816, or in the constitution of 1851, or in the legislative acts upon the subject, by which a constitution, or any of its separate articles, or any amendment thereto, could be adopted or ratified by a plurality of votes of the electors, or by any less number than a majority of the whole number cast at that election."

We do not want to indulge in captious criticism of the reasoning in *State* v. *Swift* but it seems strangely illogical to urge that an act of Congress, which authorized a majority of the members of a convention to adopt a constitution without referring it to the voters, indicates the existence of a traditional constitutional policy

which would require proposed constitutional amendments to receive the approval of a majority of all the voters of the state, or even of a majority of the "whole number cast at the election." Further, we have pointed out (*supra*, p. 179) that the phrase "majority of all the votes polled at such election," as used in the legislative act authorizing submission of the Constitution of 1851, meant majority of all the votes cast for and against the proposed constitution and the proposed Article XIII; and did not refer to all the votes cast at the political election held on the same day and conducted by the same election officials. The majority opinion in *State* v. *Swift* assumed the latter to be true.

The majority opinion in *State* v. *Swift* finds support for its reasoning in the distinction "in the Constitution, as well as in the acts of the Legislature, between voting to adopt the constitution or to ratify an amendment to the Constitution, and voting to elect an officer"; and points out that in the case of the election of a governor and lieutenant-governor "the person, respectively, having the highest number of votes for governor and lieutenant-governor shall be elected." The opinion then continues: "This difference in language between the highest number of votes and a majority of all the votes is not the mere accident of composition; the words are used advisedly." We agree that the words "highest number of votes" are used advisedly; but we feel sure that the reason for their use was to take care of the situation when there should be three or more candidates for governor or lieutenant-governor. If the Constitution required a candidate for the office of governor to receive a majority of votes in order to be elected, it might often happen that no candidate could be elected if there should be more than two candidates; and this could be true whether the required majority should be

a majority merely of votes cast in the governorship contest, or at the election, or of all qualified electors of the state. The framers of our Constitution evidently believed that the public interest would be best served by limiting the popular balloting for the highest executive officers to one election. This is further indicated by the provision that "in case two or more persons shall have an equal, and the highest, number of votes for either office, the General Assembly shall, by joint vote, forthwith proceed to elect one of the said persons governor or lieutenant-governor, as the case may be."[9] In all other cases of election of public officials the General Assembly is free to decide whether an election shall be determined by the majority or plurality rule.

The opinion calls special attention to §3 of Art. VII. We quote the following:

> "Section 3 of article 7 of the constitution, providing for the election of supreme judges, declares that 'One of said judges shall be elected from each district, and reside therein; but said judge shall be elected by the electors of the State at large.' In this provision, in reference to the election of an officer, the phrase *majority of the electors* is not used, as it is in the section in reference to the ratification of an amendment to the constitution. We must suppose that the framers of the constitution meant just what, in plain words, they said; and that the people who ratified their labors understood them in the same sense."[10]

Here again we think the opinion gives a special significance which is not justified. It is clear that in the phrase "shall be elected by the electors of the state at large" the emphasis is upon the requirement that the election be by the electors of the State as distinguished from the electors of the district *from which* the judge is elected and in which he must reside. We see no significance in the omission of "majority" since there was

---

*Note 9.* Indiana Constitution, §5, Art. V.
*Note 10.* State v. *Swift, supra,* 69 Ind. at pp. 517-518.

no reason for using it in view of the obvious subject matter of the section.

The majority opinion in *State* v. *Swift* refers to the 15th clause of the schedule. of the Constitution, which authorized the formation of a new county out of contiguous territory "of the counties of Perry and Spencer," and comments as follows:

> "In the 15th clause of the schedule of the constitution, authorizing a new county to be created out of territory contiguous to the counties of Perry and Spencer, it is provided that, 'if a majority of all the votes given at said election shall be in favor of the organization of said new county, it shall be the duty of the General Assembly to organize the same.' In the constitution, and throughout the legislation of the State, we believe without exception, whenever a majority of all the votes is required to carry a measure, it is so stated in substantial words; and, when a plurality of votes is sufficient to elect an officer, it is declared that whoever shall receive the highest number of votes shall be elected, or that the electors shall elect the officer, without stating that it shall require a majority of the electors to make a choice."[11]

As already stated, (*supra*, p. 182) only in case of the election of governor and lieutenant-governor is there a constitutional provision that the candidate receiving the highest number of votes shall be elected. But it does not follow that the absence of a constitutional provision "stating that it shall require a majority of the electors to make a choice" is equivalent to a constitutional declaration that a plurality is sufficient to elect an officer. It merely indicates an intention to leave that matter to the General Assembly.

There are only two provisions in our Constitution

*Note 11. State* v. *Swift, supra,* 69 Ind. at p. 518.

with respect to the number of votes required to carry a "measure" or "proposition," and both provisions ■ are in the schedule. One requires the proposed Article 13 to be submitted as a "distinct proposition" and the other is the "new county" provision. (*supra*, p. 184). The vote required to carry Article XIII is "a majority of the votes cast;" and to carry the proposition to form a new county it is "a majority of all the votes given at said election.[12] Yet we cannot attach any special significance to the use of "majority" since plurality and majority come to the same thing when the election is on a proposal to adopt or reject a proposition. Either "majority" or "plurality" means the greater number of those whose votes decide; but neither indicates whether the decision rests with "the greater number" of all who are entitled to vote or with "the greater number" of those who vote upon the proposition. In the constitutional provisions above referred to the context clearly defines the group of voters the approval of a majority of which is necessary to adopt the proposition in question. In one case it is all who cast votes for or against the proposition; in the other it is all who vote at the general election at which the proposition is submitted. So in the case of §1, Art. XVI of our present Constitution the word "majority" as used in the phrase "majority of said electors" merely means "the greater number" of whatever group of electors is fixed by the context of Article XVI. If the language of Art. XVI had required a proposed amendment to be submitted at a general election and had provided further that it must be approved by a majority of "all the votes given at said election," or by a majority of all the qualified electors of the state there could be no question as

---

*Note 12.* Indiana Constitution, Schedule, cl. 15.

to what voters or electors make up the group a majority of which is required to amend the Constitution.

In both *State* v. *Swift* and *In re Denny* the majority opinions assume that in construing the language in Article XVI special weight should be given to the fact that the language is in a constitution. The fallacy of this assumption is pointed out in the dissenting opinion of Niblack, J. His statement is as follows:

"But it is objected that the construction given as above to statutes governing certain elections has no proper application to constitutional provisions, and especially to cases like the one before us. I am unable to see the force of that objection. It is doubtless fair to assume, that greater care and deliberation are observed in the use of words when framing a constitution, than are ordinarily used in the enactment of a statute, but when, in relation to the same general subject, the same or equivalent words are used, both in a constitution and in a statute, there is nothing, either in reason or in the authorities, requiring a different construction to be given to such words when found in the constitution, from that which ought to be given to them when used in the statute.

"In construing constitutions, as well as statutes, the general maxim is 'that the words used are to be interpreted, and explained, conformable to the general usage.' Smith Constitutional Construction, 629, sec. 481.

"There is a striking analogy, and generally an entire harmony, between the rules of interpretation of constitutions and those of statutes.' Potter's Dwarris on Statutes & Constitutions, 654. Sedgwick on Statutory & Constitutional Law, 2d ed., p. 404."[13]

We think it is accurate to say that the consideration which most powerfully influenced the reasoning in *In re Denny* was the assumption that "electors" as used in Art. XVI was deliberately used by the framers of the Constitution to precisely and necessarily designate that group of persons in Indiana "possessed of the legal

Note 13.    69 Ind. 505, 532.

qualifications entitling them to vote." Indeed the opinion states that a "cumbersome equivalent" of the language in question is the following:

> " 'If more than half of the persons in the State who possess the legal qualifications entitling them to vote shall ratify the proposed amendment, it shall become a part of the Constitution.' "[14]

The reasoning is obvious: (1) By "electors of the state" is meant those legally entitled to vote. (2) Majority means "more than half." (3) Therefore a majority of "said electors" means more than half of those persons in Indiana who are legally entitled to vote. This was decisive and in the language of the court "the question becomes one, not of constitutional construction, but of evidence." The following statement furnishes the background of the court's reasoning:

> "If a majority of the electors of the State shall ratify a proposed amendment, it shall become a part of the Constitution; otherwise not. There is no room for construction. The language is too plain to admit of quibbling. 'Majority' means 'more than half.' 'Electors,' with reference to an election, means, according to the lexicographers and universally accepted usage, 'persons possessed of the legal qualifications entitling them to vote'."[15]

We do not believe that at the time of the adoption of the Constitution there was such a recognized distinction between the meaning of "electors" and "voters" as to justify the unqualified assumption that "the framers of our Constitution deliberately selected and used" the word "electors" for the purpose of indicating that "majority of electors" meant majority of those persons qualified to vote as distinguished from *majority of those exercising* their right to vote. The 1847 edition of Webster defines elector as "one who elects or one who has the right of choice." The same definition is found in Worcester (1859) and the latter dictionary defines voter

Note 14.   156 Ind. 104, 108.
Note 15.   156 Ind. 104, 108.

as "one who has the legal right to vote or give his suffrage." Evidently lexicographers of the period of the adoption of the Constitution did not make the absolute distinction between the meanings of elector and voter which *In re Denny* assumes was recognized. And what is more important, and conclusive, it is apparent from an examination of certain sections of our Constitution that elector and voter are used interchangeably.[16]

In view of the context of the sections containing the words "voters" and "electors" we cannot assume that the construction of Art. XVI, §1, would be different if "voters" were substituted for "electors." Indeed such provisions as "submitted to the voters" or "electors," "elected by the electors" or "by the voters" are equivalent to "submitted to popular vote" and "elected by popular vote." And whether the language happens to be

*Note 16.* Art. IV, § 2—Members of the General Assembly "shall be chosen by the electors of the respective counties or districts."

Art. V, §4—In voting for Governor and Lieutenant-Governor "the electors shall designate for whom they vote as Governor and for whom as Lieutenant-Governor."

Art. VI, §1—"There shall be elected by the voters of the state, a Secretary, an Auditor . . ." etc.

Art. VI, §2—"There shall be elected, in each county, by the voters thereof, . . ."

Art. VII, §3—"said Judges shall be elected by the electors of the state at large."

Art. VII, §7—"There shall be elected by the voters of the state, a clerk . . ."

Art. VII, §9—"judge for each circuit shall be elected by the voters thereof."

Art. VII, §11—"There shall be elected . . . by the voters thereof, a prosecuting attorney . . ."

Art. VII, §21—"every person of good moral character, being a voter, shall be entitled to admission to practice . . ."

Art. VI, §4—"No person shall be elected or appointed as a county officer who shall not be an elector of the county . . ."

Art. VIII, §8—"The general assembly shall provide for the election, by the voters of the state, of a superintendent of public instruction . . ."

Schedule, par. 14—"No article or section of this Constitution shall be submitted as a distinct proposition to a vote of the electors . . ."

Schedule, par. 15—"The proposal to create such new county shall be submitted to the voters of said counties . . ."

"majority of said electors," or "majority of said popular vote" or majority of "said voters," we still are compelled to determine from the context, and with the aid of general rules of usage, whether the group of which a majority is required consists of the whole body of electors or voters or merely of those who exercise the right of suffrage. The fatal error in the majority opinions in *State* v. *Swift* and *In re Denny* was in assuming (1) that "electors of the state" defined this group to consist of all persons in the state legally entitled to vote and (2) that the only problem was that of determining the actual number of qualified voters in the state.[17]

We approve the statement of the Supreme Court of the United States in *County of Cass* v. *Johnston*, (1874), 95 U. S. 360, 24 L. Ed. 416, which was relied upon by Niblack, J., in his dissenting opinion in *State* v. *Swift*.[18]

That statement is as follows:

" 'This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted unless the legislative will to that effect is clearly expressed.' "
And we approve the following comment by Niblack, J.:

"The rule laid down as above, by the Supreme Court of the United States, the highest court in this country, appears to be a general rule applicable alike to all classes of popular elections, and to be overwhelmingly sustained by the weight of authority.

"I think it may be safely stated, as a rule of law

*Note 17.* Or, as stated in *In re Denny*, "so in any case, the question becomes one, not of constitutional construction, but of evidence." 156 Ind. 104, 109.

*Note 18.* 69 Ind. 505, 531.

in American elections, that, where a majority vote is necessary to carry an election, a majority of all the votes cast is sufficient, unless there be some statutory or constitutional provision to the contrary."[19]

As already stated we think the same rules of construction should be applied to constitutional provisions as to statutory provisions when, "in relation to the same general subject, the same or equivalent words are used both in a constitution and a statute." Consequently we consider the following statement applicable to the constitutional language in question:

"Where a statute requires a question to be decided or an officer to be chosen by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast, provided always that there is a fair election and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. The 'voters of the county' referred to by all such statutes are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast and not by an inquiry as to the number not cast. This doctrine is well settled by the authorities."[20]

If this court had followed the reasoning in the opinion in the case of *City of South Bend* v. *Lewis* (1894), 138 Ind. 512, 37 N. E. 986, and had given effect to the rules announced in that decision the result in *In re Denny* would have been different. The opinion in *City of South Bend* v. *Lewis*, written by Dailey, J., makes

*Note 19.* 69 Ind. 531.
*Note 20.* McCray on Elections (4th ed.) §208, quoted in *In re Denny, supra,* 156 Ind. 104, 134.

the most constructive contribution to our problem found in any opinion of this court. The language involved which required construction in that case was in a statute authorizing two municipal corporations to consolidate, provided a "majority of the qualified voters of the town and a majority of the qualified voters of the city shall vote in favor thereof, at elections to be held as hereinafter provided." The statute authorized designated officials to agree upon the time of holding the election and further provided that "if a majority of the votes given in the town as well as a majority of the votes given in the city are in favor of union or annexation," such union or annexation should be declared accomplished. The election in question in *City of South Bend* v. *Lewis, supra,* was held on the day of the general city election in the city. The total number of votes cast for candidates at the city election was over 5,000, while the number of votes favoring the proposed union was 1750 and the number against was 237. This court construed the language of the statute above quoted to mean that "the only votes to be counted or considered were those cast for or against the proposition." The court gave special significance to the fact that the inspectors and judges were to return to the common council and board of trustees only the votes cast in the "election held for the people of such town and city to vote upon the question of such union or annexation." Since Art. XVI of the Constitution contemplates that elections on proposed constitutional amendments shall be separate from general elections and authorizes provision for a tabulation of votes cast for and against amendments it would seem that there is a close analogy between the provision construed in *City of South Bend* v. *Lewis* and the submission clause of Art. XVI.

We are convinced that the reasoning and conclusions

of the opinion in *City of South Bend* v. *Lewis* are sound and should be followed in construing the language of §1, Art. XVI. We expressly approve and adopt the following as applicable to the question under consideration:

"From what we have said, we think it clearly appears that four leading principles may be considered as fully established, namely:

"First. Where a measure is proposed to the people, and its adoption made to depend on a vote of the majority, those who do not vote are considered as acquiescing in the result declared by those who do vote, even though those voting constitute a minority of those entitled to vote.

"Second. Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at 'such election,' a majority of all the votes cast at the election is meant, and not merely a majority of the votes cast on that particular question.

"Third. Where, at a general election, a proposition is submitted to the voters, the result of the vote on the proposition will be determined by the votes cast for and against it, in the absence of a provision in the law, under which it is submitted, to the contrary.

"Fourth. Where a legislative body provides that a proposition shall be submitted to the voters; that those in favor of the proposition shall cast an affirmative vote, and that those electors opposed to the proposition shall cast a negative vote, and that a 'majority of the votes given' shall be requisite to the adoption of the proposed measure, then the only votes to be counted and considered in determining whether the measure is adopted or not are those which are given on the particular question involved.

"Of the correctness of these four principles we think there can be no dispute. The only doubts which can arise are those occasioned by a confusion of the second and third. Indeed it may be said that the first and third principles are identical, and con-

trol all such cases except such as are controlled by statutes or constitutional law."[21]

The particular language which must be construed in the instant case is as follows:

". . . it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the state; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution.

"2. If two or more amendments shall be submitted at the same time they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately; . . ."

The foregoing does not require a proposed amendment to be submitted to the electors at a general election. Consequently Judge Dailey's second principle does not govern. We find a perfect example for the application of the second principle in paragraph 15 of the Schedule of the Constitution (*supra,* p. 184) which authorizes the submission of a proposal to "the voters of said county, at a general election" and further provides that "a majority of all votes given at said election" shall be required to carry the proposal. Another example is found in Art. VIII of the Constitution of 1816. This article authorized the General Assembly to submit a proposal for a constitutional convention to the "electors" of the state at a general election, and, for the approval of such proposal, specifically required a "majority of all the votes given at such election." But in the absence of some constitutional requirement that proposals to amend be submitted at general elections the General Assembly cannot, by providing for submission at such time, overturn the result of the voters' decision on the adoption of an amendment by requiring such adoption to depend upon the vote on political candidates. In short, the effect of

*Note 21.* 138 Ind. 512, 536.

omitting any reference to a general election is to treat a submission of a proposed amendment as a separate and distinct election, even though the submission be on the day of a general election and even though the machinery at the general election be used to poll, canvass and return the votes cast in the election on the amendment.

We have already indicated (*supra*, p. 188) that, in our opinion, "electors of the state" is not used in Art. XVI to designate the persons to compose a group a majority of the members of which must approve a proposed amendment in order for it to become a part of the Constitution. The words merely designate the part of our political organization to which the question ultimately must be referred, i.e. the people as contrasted to some agency such as the General Assembly or a constitutional convention. And since there is an absence of any language which requires a majority of all "persons possessed of the legal qualifications entitling them to vote" or a majority of all votes cast at a general election we believe the submission clause falls within the first and third propositions of Judge Dailey. Also we think the fourth is pertinent because §2 of Art. XVI provides that "if two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against such amendments separately."

Our conclusion is that under the submission provision of §§1 and 2 a proposed amendment becomes a part of the Constitution if it receives a majority of the votes cast for and against its adoption, and this is true whether such amendment is submitted at a special election or at the time of a general election. Further, in view of the provision requiring two or more amendments, if submitted at the same time, to be "submitted in such manner that the electors shall vote for or against each

of such amendments separately," we are of the opinion that the intent of the section is to make the adoption of each proposed amendment dependent upon the vote cast on that particular proposition.

But even if we should follow the ratio *decidendi* of *In re Denny* we think our construction of Art. XVI should be the one stated above. The fundamental assumption in In re Denny is that "electors of the state" definitely fixes a group a majority of the members of which must approve a proposed amendment in order for it to become a part of our Constitution. The opinion then assumes that "electors of the state" fixes this group as all persons in the state who are entitled to vote on the proposed amendment or amendments. But since "electors," as used in the Constitution, may mean either those voting at an election or those legally entitled to vote at such election it is obviously as reasonable to assume that "electors of the state" means all persons in the state who vote on the proposed amendment or amendments. And the latter meaning should be preferred in view of the generally recognized rule that election results are determined by that group of electors or voters who exercise their right of suffrage.

The proceedings in the Constitutional Convention have been referred to in the majority and minority opinions in both *State* v. *Swift* and *In re Denny*. Our examination of the proceedings and debates as recorded in the Convention Journal and Debates and Proceedings of the Convention lead us to agree with the following conclusion of Jordan, J.:

"An examination of these debates apparently discloses that it was the affirmative sense or meaning of the convention to fix or provide no particular time for an election at which proposed amendments should be submitted to the people. Neither does it appear that it was intended to fix or provide, aside

from the usual and ordinary one, any particular method or criterion for ascertaining the majority of the electors voting at an election called in pursuance of an act of the legislature for the submission of proposed amendments."[22]

We believe the following general observations of Jordan, J., are sound and applicable to the construction of Art. XVI:

"It is a fundamental principle under our government, as the authorities assert, which must have been understood, by the framers and ratifiers of our Constitution, that a majority of those who exercise the right of suffrage shall control in its affairs. It must be further presumed that they also knew and understood that the usual and ordinary mode of ascertaining or evidencing such majority is by giving all legally entitled to vote on a proposition an opportunity to do so, and then counting such persons as choose to exercise the right of suffrage by casting an affirmative and negative vote on the given proposition, the difference between the two votes constituting the majority essential to its adoption or approval. I may also indulge in the presumption that the men who framed the Constitution and the people who ratified their work must have understood that the great body of electors of the State is composed of a changing, uncertain, or indefinite number, which it is difficult at any given time actually to ascertain. They also presumably knew that there were thousands comprising that body who by reason of religious or conscientious views, or indifference, or from other reasons, decline when the opportunity is presented to exercise the right of suffrage. That while many do not vote at all others will vote only for some particular proposition or officer and will fail or decline to vote for others, and that therefore the most feasible and simplest method was the one universally recognized in the eye of the law long before the adoption of our Constitution, namely, give all entitled to vote an opportunity to exercise this privilege and then combine or aggregate the whole number of votes upon a given proposition or measure submitted to the electors of a

Note 22. 156 Ind. 104, 155.

district or locality; such combined vote to be taken or accepted upon any given proposition for all practicable purposes as comprising the whole number of the electors of the particular district or locality. This method of measuring the whole number is the one, as the authorities disclose, generally adopted, except where a different one is expressly prescribed. In such cases the non-voting must be counted as willing to be bound by the action of the majority who did vote upon the particular proposition, or, in other words, they may be considered as tacitly assenting to the result of those voting, and in this manner or by this method all of the electors of the district, or State, as the case may be, are taken into account."[23]

An examination of the language of the various proposals confirm the foregoing estimate of the understanding of the members of the Constitutional Convention. Most of the proposals are carefully phrased so as to expressly designate the group of voters of which a majority is required to decide whether a convention shall be called or an amendment adopted. With one exception, in each case where the controlling electoral group is expressly designated it is a group other than the group composed of those voting upon the proposition. Mr. Pettit's proposed section designated as the controlling electoral group "all the voters of the state."[24] Mr. Tague offered a resolution that Art. VIII of the existing constitution be amended to authorize the Legislature to propose amendments to a vote of the people "at the next election for governor." The controlling group was to consist of all who voted at the election.[25] The first draft of an amendatory article submitted by the Committee on Future Amendments provided for the calling of a convention as well as for the submission of amendments. The controlling electoral group in each

*Note 23.* 156 Ind. 155-156.
*Note 24.* Convention Journal, p. 837, Debates in Indiana Convention, Vol. II, p. 1938.
*Note 25.* Convention Journal, p. 66.

case was designated as "all electors of the State voting for representatives," and the approval of a majority of this group was required.[26] The proposals of Mr. Helmer,[27] of Mr. Frisbie[28] and of Mr. Bascom[29] made all the voters voting at a general election the controlling electoral group.

In contrast to the foregoing we find several proposals containing general language similar to that of the present amendatory sections. Mr. Read offered a resolution directing the committee on future amendments "to engraft in the new constitution" an article which, in relation to submission and adoption, provided "that such proposed amendment or amendments shall be submitted to the people at said election, and if a majority of the qualified electors shall approve and ratify such amendment or amendments, the same shall become a part of the constitution."[30] When Mr. Read's resolution was taken up for consideration by the convention Mr. Stevenson moved to strike out "a majority of the qualified voters"[31] and to insert "a majority of all the votes cast for and against the same." Mr. Read expressed his willingness to accept the amendment with the remark: "It is precisely what I intended."[32] The amendment was approved by the convention. It is evident that the author of the resolution understood that "majority of qualified electors" (or voters) meant a majority of qualified electors, or voters, who vote upon a proposition. We do not know whether the members of the convention approved the amendment because they agreed with Mr.

*Note 26.* Convention Journal, p. 693, Debates, etc., 1641, 1913, 1914.
*Note 27.* Convention Journal, 841.
*Note 28.* Convention Journal, 69.
*Note 29.* Convention Journal, 830.
*Note 30.* Convention Journal, 444.
*Note 31.* It is apparent that either the reporter or Mr. Stevenson inadvertently used "voters" instead of "electors"; since "electors" appears in the complete draft as printed in the Journal.
*Note 32.* Debates, etc., 1258, Remarks of Mr. Read, 2d Column.

Read that it was merely a matter of form or because they thought the change material. But in either case they affirmatively declared in favor of the requirement that the controlling electoral group consist of all the voters who vote for or against the adoption of a proposed amendment, and there was no express repudiation of this position by any subsequent action of the convention.

Mr. Owen participated in the discussion of Mr. Read's resolution and made certain objections which he summed up in the following statement:

> "Now, I think, if it be made imperative that an amendment proposed to be made in the Constitution, shall be voted for by two successive Legislatures, to be elected with reference to that particular subject, the question will be debated before the people, and they will send Senators and Representatives here with a special reference to that question. This, it appears to me, will be a sufficient guard against improper and ill-advised amendments, without restricting the action of the Legislature to periods of ten years."[33]

Later Mr. Owen offered a substitute section as an amendment for section 2 of the article reported by the Committee on Future Amendments,[34] and Mr. Stevenson accepted this in lieu of his proposed amendment. In this section, which was substituted by the Convention, Mr. Owen incorporated his views which he had expressed during the discussion on Mr. Read's resolution. In addition he included the following submission and adoption provision:

> ". . . it shall be the duty of the Legislature to submit such amendment or amendments to the qualified electors[35] of the state; and if a majority of said electors shall ratify the same, such amendment or

Note 33. Debates, etc., 1259.
Note 34. Debates, etc., 1913, Convention Journal, 832.
Note 35. The copy in Debates of the Convention reads "qualified voters."

amendments shall become a part of the Constitution."

The submission and adoption language of Mr. Owen's section must mean substantially the same as that in Mr. Read's resolution, and it is not likely that Mr. Owen intended his language to designate all the qualified electors, or voters, of the state as the controlling electoral group in face of Mr. Read's declaration that he intended substantially the same language to designate those voting upon the proposition as the controlling group. Mr. Owen did not express any opposition to the policy of adopting an amendment by a majority of those voting for and against it, and Mr. Stevenson, who had expressly declared for such a requirement, adopted Mr. Owen's substitute section. The Convention then approved an additional section which provided that when two or more amendments should be submitted at the same time they should be submitted in such manner "that the electors shall vote for or against each of such amendments separately." It is easy to see that requiring amendments to be submitted in such a manner that the electors could vote for and against each amendment separately is consistent with the assumption that the Convention understood that under the section which already had been approved the controlling electoral group consisted of those voting for and against an amendment. For in that case the tabulating of the votes for and against would determine the fate of each amendment.[35 1/2] On the other hand, a provision which recog-

Note 35½. "The fact that the law requires the votes to be for or against, would seem to clearly imply, that, if a majority cast on the question was for the law, it should become operative. If those not voting are to be counted against the law, why require them to vote at all on the question. It would be supererogation. as well as an affirmative vote. And that reason was, no doubt, to enable a majority voting on the question, to control in its adoption or rejection." *Holcomb* v. *Davis* (1870), 56 Ill. 413, 415. See also *Davis* v. *Brown* (1899), 46 W. Va. 716, 34 S. E. 839; *Green* v. *State Board of Canvassers* (1896), 5 Ida. 130, 47 Pac. 259, 262

nized the necessity of determining the total number of qualified voters of the state for the purpose of comparing therewith the total number of votes cast for amendments would have indicated an understanding by the members of the Convention that the adoption of amendments depended upon their being approved by a number of voters equal to a majority of all the qualified voters of the state.[36] And furthermore, if the members of the Convention intended to impose the requirement that an amendment must be approved by more than half of all the qualified voters of the state in order to become a part of the Constitution, it is difficult to explain the absence of some specific declaration to that effect since such a requirement represented a radical departure from the policy of the Constitution of 1816 and had not been discussed by any speaker during the Convention, and the only proposal which specifically included it was that of Mr. Pettit which was voted down by the Convention. Mr. Pettit's remarks show that he was opposed to the incorporation of any amendatory article in the new Constitution.[37]

and *City of South Bend* v. *Lewis, supra.* See also Ind. L. Jour., Vol. IX, No. 7 (Apr., 1934), pp. 403, 431. Compare *People* v. *Wiant* (1886), 48 Ill. 263, in which the language considered did not contain a for-or-against provision.

*Note 36.* Such a provision is found in the Kentucky Constitution which was adopted in 1850. The Kentucky Constitution authorized the calling of future Constitutional Conventions, provided that at two general elections "a majority of all the citizens of this state entitled to vote for representatives, have voted for calling a convention." The same section contained the following:

"And for the purpose of ascertaining whether a majority of the citizens, entitled to vote for representatives, did or did not vote for calling a convention, as above, the General Assembly passing the law authorizing such vote shall provide for ascertaining the number of citizens entitled to vote for representatives within the state." (§1, Art. XII, Constitution of Kentucky, adopted in 1850.)

*Note 37.* "But although I oppose putting anything into the Constitution on this subject, and although my views in regard to it may be considered revolutionary, in order that all things may be done 'decently and in order,' as St. Paul says to Timothy, (laughter, and boisterous applause) and to comply with public

The construction which we place upon Art. XVI will harmonize our legal theory and practical results. Under the holdings of this court in *State* v. *Swift, In re Denny, In re Boswell,* and *Simmons* v. *Byrd* (1922), 192 Ind. 274, 136 N. E. 14, we have the following situation:

(1) The rule of constitutional law is that to become a part of the Constitution a proposed amendment must be approved by a majority of all the qualified voters of the state.

(2) The rule of evidence is that the total number of votes cast at the election at which the amendment is submitted is accepted as representing the total number of qualified voters of the state.

(3) When an amendment is submitted at a general election it must receive a majority of all the votes cast for political candidates to be ratified.

(4) If such amendment is submitted at a special election it is ratified if it receives a majority of the votes cast for and against its adoption.

In short we have a theoretical rule of constitutional law which the General Assembly can suspend, for all practical purposes, by submitting single amendments at special elections. One of the most instructive examples of the practical working of the rules heretofore announced by this court is found in the fate of seven

opinion—with the public expectation on this subject—I will propose—if the present proposition be voted down—the following:

" 'The Legislature may, at its regular session, call a convention to amend or alter the Constitution.' " Debates, etc., p. 1917, Remarks of Mr. Pettit, 2nd column.

"Sir, I am clearly of the opinion that we are encumbering our records too much with these propositions for amendment. All experience shows us that the people of the several States of the Union will amend the Constitutions of their States whenever and in whatever mode they see fit. Thirty years ago our fathers formed a Constitution in which they inserted a provision that it might be amended in such a mode, and in no other manner. Yet here we are proposing to violate that very provision.

"I move to re-commit, with instructions to strike out the section and insert the following:

" 'No amendment shall be made to the Constitution unless the

amendments which were first submitted at the annual spring election of 1880. Each amendment received a majority of the votes cast for-and-against, but under the decision of this court in *State* v. *Swift* none of these amendments was ratified. The General Assembly of 1881 resubmitted[38] these amendments at a special election on March 14, 1881, and again each one received a majority of votes cast for-and-against and became a part of the Constitution. An interesting fact is that the vote upon each amendment at the special election was much smaller than at the regular election. The result of applying the rule of *State* v. *Swift* was that seven amendments failed of ratification with an approval vote greater by many thousands than the approval vote by virtue of which they became a part of the Constitution.[39] Furthermore, the vote cast for each amendment

same shall have been called for and approved of by a majority of all the voters of the state.'" Debates, etc., 1938, Remarks of Mr. Pettit.

Note 38. "The amendments to the Constitution which, at the last spring election were submitted to the electors for adoption or rejection, have been held by the Supreme Court in opposition to what, it is believed, had, previously to the decision, been the general sense of the legal profession, not to have been constitutionally adopted.

"The court, while deciding thus, took occasion to express an opinion that another submission might take place, notwithstanding the submission and vote which have occurred if the Legislature shall choose to provide therefor by an appropriate enactment. The court, though not now composed entirely of the same members as when the decision was made, will it is believed, feel constrained to accommodate itself to this suggestion, whatever view the new judges might entertain, if the question were one of first impression.

"I, therefore, earnestly recommend that a bill be speedily passed, giving the electors of the state another opportunity to pass their judgment upon these amendments." From inaugural address of Governor Albert G. Porter, Jan. 10, 1881, p. 81, House Journal of 1881.

Note 39. The following table shows the vote upon each proposed amendment at the annual spring election of 1880 and at the special election held March 14, 1881, respectively:

| Proposed | Election of 1880 | | Special Election of 1881 | |
| --- | --- | --- | --- | --- |
| | Yes | No | Yes | No |
| Amendment No. 1 | 169,483 | 152,251 | 123,736 | 45,975 |
| Amendment No. 2 | 177,304 | 138,985 | 124,952 | 42,896 |

at the special election was less than the vote cast against it at the regular election.

The actual situation is that we have theoretically a rule of law which requires a proposed amendment to be approved by a majority of the qualified voters of the state; a rule which cannot be made effective unless the General Assembly sets up machinery to enumerate all qualified voters of the state as of the day of election on a proposed amendment. In the absence of such machinery this court has adopted the so-called "rule of evidence" the result of the application of which is, in practical effect, the same as if the Constitution expressly provided:

(1) If an amendment be submitted at a general election it must be approved by a majority of all the votes cast in such election; or
(2) If submitted at a special election it must receive a majority of all votes cast for and against its adoption.

And the foregoing leaves no situation for the application of the primary constitutional requirement of a majority of all qualified voters.

We recognize that it is a sound policy to discourage the making of hasty and inadequately considered changes in our Constitution. But that policy is made effective by the requirement in Art. XVI that proposed amendments must be approved by a majority of all the members of two General Assemblies. Mr. Owen, one of the most enlightened members of the Convention, considered this sufficient, as is indicated by his above-quoted remarks before the Convention (*supra*, p. 199). We also recognize the fundamental soundness of the policy of

| | | | |
|---|---|---|---|
| Amendment No. 3 | 173,921 | 144,897 | 128,038 | 40,163 |
| Amendment No. 4 | 176,145 | 136,716 | 125,170 | 42,162 |
| Amendment No. 5 | 181,684 | 137,175 | 128,731 | 38,345 |
| Amendment No. 6 | 175,626 | 141,318 | 116,550 | 41,434 |
| Amendment No. 9 | 176,943 | 126,953 | 126,221 | 36,435 |

(See Kettleborough, Constitution Making in Indiana, Vol. II, pp. 619-631.)

submitting all proposals to change the Constitution to popular vote, but that policy is not violated by a construction of Article XVI which preserves the right of the qualified voters of the State to adopt or reject proposed amendments to the Constitution but leaves the decision with the majority of those qualified voters who participate in the voting. Progress in popular government should not be at the mercy of those who have no interest in the problems of government.

If the Constitution properly construed requires the approval of a majority of all the qualified voters of the state to ratify an amendment this court cannot judicially adopt and apply a "rule of evidence" which completely nullifies the intent of the Constitution. We should give effect to that construction even though it would mean that many proposed amendments which are assumed to have been constitutionally adopted are no part of our present Constitution. But that result can be avoided since we are convinced that such construction is erroneous and that the true construction is as we have stated (*supra*, p. 194).

Since the proposed amendment, "that the constitution of the State of Indiana be amended by striking out all of section 21 of article VII," which was submitted at the general election in 1932, received a majority of all the votes cast for and against it, we hold that §21 of Art. VII was stricken from the Constitution. Since petitioner's claim to admission without examination rests entirely upon §21 of Art. VII it follows that his petition must be dismissed.

Fansler, C. J., dissents with opinion.

DISSENTING OPINION.

FANSLER, C. J.—The questions involved are so important and have such a far-reaching effect that I deem it necessary to give my reasons for withholding my assent to the views of the majority of the court.

By his petition, Lemuel S. Todd seeks admission to the practice of law at the bar of this court upon establishing that he is of good moral character and a voter of this state. A constitutional amendment, changing the original provision of the Constitution concerning admission to practice, was submitted to the people at a general election. It received a majority of the votes of those voting upon the question of the amendment, but less than a majority of those voting at the general election. It is contended that the amendment was adopted.

It is also asserted by those opposing the petition that if the amendment was not adopted there is still inherent power in the court, over and above the Constitution, to prescribe rules for admission to practice, and that the original constitutional clause does not have the effect of limiting the court's inherent power. It is further asserted that, even though the court's power is limited by Constitution, good moral character may be defined by the court, and that term may be interpreted as requiring that one who seeks to practice have a legal education before he can be deemed to be of good moral character.

Section 1 of Article 16 of the Constitution of Indiana provides that if an amendment to the Constitution proposed in the General Assembly shall be agreed to by a majority of all the members elected to two consecutive Assemblies, it shall be the duty of the General Assembly to submit such amendment "to the electors of the state; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution." The question presented is, whether the language of the Constitution requires that "a majority of said electors shall ratify," or that *a majority of said electors voting upon the question shall ratify.*

In other words, does the language of the Constitution mean exactly what it says, or something else which requires that additional words be supplied to make the meaning clear?

In *Greencastle Twp., etc., et al.* v. *Black* (1854), 5 Ind. 566, 570, Stuart, J., speaking for this court in a learned opinion, said:

". . . the discretion of Courts is more restricted in applying the rules of construction to a plan of government contained in a written constitution, than in the construction of statutes. And the reason is conclusive. Statutes are often hastily and unskilfully drawn, and thus need construction to make them sensible. But constitutions import the utmost discrimination in the use of language."

Then he quotes:

" 'They are the permanent will of the people, intended for the guidance of posterity.' Thus, *Marshall*, C. J., in relation to the Constitution of the United States: 'The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said.' *Gibbons* v. *Ogden*, 9 Wheat. 188."

This court said in the case of *Lafayette, etc., R. Co.* v. *Geiger* (1870), 34 Ind. 185, 202:

"We recognize as correct the doctrine so repeatedly enunciated by the highest courts and ablest lawyers, that constitutions are to receive a strict construction, . . . "

It is disclosed by the Convention Journal that Mr. Read, a member of the Constitutional Convention, offered a resolution directing the committee on future amendments to insert a clause providing "that such proposed amendment or amendments shall be submitted to the people at said election, and if a majority of the qualified electors shall approve and ratify such amendment or amendments, the same shall become a part of the constitution." When Mr. Read's resolution was taken up for consideration, Mr. Stevenson moved to

strike out "a majority of the qualified voters," and to insert "a majority of all the votes cast for and against the same." Mr. Read expressed his willingness to accept the amendment with the remark: "It is precisely what I intended." It is not clear whether Mr. Read meant that the amendment was what he intended to suggest, or whether he thought the amended language was identical in meaning with the language of his resolution, which it clearly is not. But in any event it appears that Mr. Stevenson saw the distinction. The two clauses being before the convention at once, the members of the convention must have clearly discerned the difference. What discussion occurred in committees or among the members privately upon the subject, we do not know, but when the constitution was finally adopted it contained the words of Mr. Read's original resolution in substance. From this we must conclude that the convention considered the proposal to amend, either by ratification by a majority of all of the electors of the state, or ratification by a majority of the votes for and against the same, and rejected the latter and adopted the former. No other conclusion is logically possible if we adhere to the rule that "constitutions import the utmost discrimination in the use of language."

Three times the identical question has been before this court. In the first case, *State* v. *Swift* (1880), 69 Ind. 505, it was decided by a divided court that the clause means a majority of all the electors. The majority opinion was written by Judge Biddle, who was a member of the constitutional convention. *In re Denny* (1901), 156 Ind. 104, 59 N. E. 359, this court reached the same conclusion, again by a divided court. *In re Boswell* (1913), 179 Ind. 292, 100 N. E. 833, the former cases were sustained by the entire court. In the latter case, Cox, J., speaking for this court concerning the cases cited, said (p. 296):

"To that holding we adhere. It has been considered by this court in the cases cited that the provision is too plain to carry more than one meaning and that the question in any case is not one of construction but of evidence to determine the number of electors in the State and whether an amendment has received a majority of them."

In this latest case the court seems to have treated the question as settled by the prior adjudication. The writers of the dissenting opinions in the first two cases leaned heavily upon the proposition that "it is a fundamental principle under our government, as the authorities assert, which must have been understood by the framers and ratifiers of our Constitution, that a majority of those who exercise the right of suffrage shall control in its affairs."

*In re Denny, supra.*

But it can hardly be said that the framers of the Constitution intended the clause which they adopted to mean exactly what was proposed to them in open session as a substitute and rejected. Much of the difference of opinion apparent in the two earlier cases involved the method of determining the whole number of electors, ratification by a majority of which was necessary to amend the Constitution. But that question was not before the court in either case, since both cases involved a proposed amendment voted for at a general election, and, although it received a majority of the votes cast for and against, it received less than one-half of the total number of votes cast at the election. It is obvious that, upon such a state of facts, it is not necessary to determine the whole number of electors in the state, since it is clear that, even though there may have been more electors than those voting at the election, the amendment, not having been ratified by one-half of those voting, clearly could not have been ratified by a majority of all of the electors.

But even though the question was not presented by the records, those cases seem to have been treated as laying down a rule which has since been generally accepted and acquiesced in to the effect that, as a practical matter, the whole number of voters voting at a general or special election may be taken as the whole number of electors of the state. No argument is necessary to convince that, in strictness, this cannot be true; but it is obvious that great difficulties are involved in determining accurately the entire number of electors in the state, a consideration which, no doubt, prompted the announcement of the practical rule.

Unless we overthrow the rule established under the cases referred to, and overrule those cases upon the theory that the words "a majority of said electors" mean *a majority of said electors voting upon the question,* the proposed amendment in question cannot be deemed to have been adopted without further extending the questionable rule of evidence referred to. To so extend that rule, admittedly inaccurate in its inception, we must go a step further and say that, since the total of electors voting for and against a constitutional amendment at a special election may be treated as the whole number of electors in the state, then the adoption of an amendment submitted at a general election is to be determined by a majority of the electors voting for and against said amendment regardless of the fact that the number of those voting to adopt the amendment be less than one-half of the whole number of electors voting at said election.

The rule that the number of electors voting at an election may, as a matter of evidence, be treated as the whole number of voters of the state, was announced out of the apparent necessity of having some practical method of establishing the facts. But there is no sound reason for extending the rule, even though regard for

precedent may dictate that it should not be overturned.

For more than fifty years the amendment section of the Constitution has been interpreted as requiring a ratification of an amendment by a majority of the electors of the state. The interpretation is supported by three decisions of this court, the last one a unanimous decision which treats the question as settled. Even if not convinced upon the merits of the question, and there has been much difference of opinion, these precedents should be given great weight and force in deciding the issue.

In *Board of Commissioners of White County* v. *Gwin, Sheriff, et al.* (1894), 136 Ind. 562, 580, 36 N. E. 237, this court said, concerning a non-judicial construction which has been put upon the Constitution and acquiesed in:

> "If there were any doubts as to the correctness of this construction, the great length of time it has been received and acted on, according to the principles already laid down, gives to it the force of positive law."

Buskirk, J., in a careful and exhaustive opinion in the case of *Lafayette, etc., R. Co.* v. *Geiger, supra,* quotes with approval a rule of construction laid down by the United States Supreme Court, and reaffirmed in many decisions, as follows (p. 203):

> "A contemporary exposition of the constitution, practiced and acquiesced in for a period of years, fixes the construction; and the court will not shake or control it."

The application of these rules is, of course, limited to those cases in which the construction to be put upon the language of the Constitution is doubtful or debatable. They do not command or require the perpetuation of a construction that is clearly erroneous. It has been said that:

> "Decisions construing the constitution or acts of the legislature should be followed, in the absence

of cogent reasons to the contrary, inasmuch as it is of the utmost importance that the organic and statute law be of certain meaning and fixed interpretation." 7 R. C. L., 1002, and cases cited.

The importance of stable and settled rules of law is generally recognized, and strong respect for precedent has become a part of our legal system.

That the rule laid down upon the question of amendment, by the decisions of this court above referred to, has been accepted and acted upon as the settled law, is illustrated by the provision in the legislation submitting the so-called "Lawyer Amendment" and an income tax amendment by the legislature in 1931. Section 8 of chapter 157 of the Acts of 1931 provides:

"If it shall appear that the number of votes cast in the state for any one or more of the proposed amendments was greater than the number of votes cast against such amendment, and equal to or greater than a majority of all of the electors who voted at the election, then each such amendment shall be deemed and taken to have been ratified by the electors of the state, and become a part of the constitution of the state, and shall be so declared by the governor in his proclamation. But if it shall appear that any proposed amendment has received in its favor a number of votes less than a majority of all the electors who voted at the election, then each such amendment shall be deemed and taken to have been rejected by the electors of the state and shall be so declared by the governor in his proclamation."

And this construction and direction to the voters was doubtless acted upon by the voters, and it can not be doubted that many, who would have voted against the amendment had they understood that only those voting for or against would be counted, merely voted at the general election and refrained from voting either way upon the amendment, believing that those thus voting would be counted against it.

This situation illustrates the soundness of the view

that an interpretation of our Constitution, repeatedly announced by this court and acquiesced in over a long period of years, should not be overturned on debatable grounds. If the clause in question can be said to be open to construction, the question of whether it means literally what it says, or means a majority of the voters voting upon the question, is at least open to reasonable debate, with so much to be said in favor of the literal construction that, at least, grave doubts must arise as to whether this court has rested in error, and, in the writer's opinion, the established rule should be adhered to.

Section 21 of article 7 of the Constitution of Indiana provides:

"Every person of good moral character, being a voter, shall be entitled to admission to practice law in all courts of justice."

That it was the clear constitutional intention that persons without legal training or education be admitted to practice, if they were voters and of good moral character, can not reasonably be doubted after an examination of the constitutional debates and the history of the times. It is urged that one who will undertake to practice law, and hold himself out as competent to do so, without legal training or education, can not be of good moral character. But such argument can not avoid the inescapable fact that the Constitution intends that legal training or education shall not be a necessary requirement. The power of the courts, like the power of the other branches of the government, may be limited by the Constitution, and is limited by this clause. It is true that, as stated by this court in *In re McDonald* (1928), 200 Ind. 424, 164 N. E. 261, "Courts may make reasonable rules and regulations for the admission (to practice law)"; but these rules must be within constitutional limits. The rules may prescribe reasonable prac-

tices concerning applications for admission, and the court to which application shall be made, the manner in which proof shall be adduced, etc. In the absence of constitutional restriction, and with or without legislative sanction, the courts might impose educational requirements or legal training, as a condition to admission to practice law; but, in the face of the constitutional provisions, they are limited in fixing qualifications to those provided in the Constitution, or to lesser qualifications. In the case of *In re Petition of Leach, Ex Parte* (1893), 134 Ind. 665, 34 N. E. 641, it was held that the courts had inherent power to admit a woman to practice, although she was not a voter; but this is not forbidden by the Constitution. The courts have power to provide by rule for the admission of persons who are not of good moral character. But the Constitution fixes, and was intended to fix, the maximum requirements that may be established by the courts. The will of the people, as expressed in the Constitution, is supreme and controls the power of the courts. It may be that educational requirements, as a condition to admission to practice, are highly desirable, and that people generally now recognize such to be the fact, but, until the Constitution is amended, courts are bound by the will of the people as expressed in section 21, article 7.

My views do not permit me to concur in the conclusion that a constitutional amendment has been accepted until it has been ratified by at least a majority of the voters voting at a general election. If the Constitution is to be treated as unamended upon the subject of admission to the bar, the statute, which assumes to give rule-making power to this court, is not necessarily unconstitutional, but is limited in its operation as the court was limited without it, but such rules as to quali-

fications as are not in conflict with the constitutional provision as originally written.

It would follow that the petitioner should be admitted to practice law upon establishing his good moral character, and that he is a voter, under such reasonable rules as the court has adopted or may adopt.