SWANK ET AL. V. TYNDALL ET AL.

[No. 28,387. Filed April 7, 1948. Rehearing Denied May 18, 1948.]

*Edward H. Knight,* of Indianapolis, for appellants.

*Arch N. Bobbitt,* Corporation Counsel, *Henry B. Krug,* City Attorney, *Wm. F. Hoffman,* Assistant City Attorney, *Grabill & Baker,* for appellee, George L. Denny, of Counsel; *Gideon W. Blain,* for appellee Dean S. Tyndall, Exec., etc., of Counsel, and *Scott Ging,* for appellees Moore and Huse, of Counsel, all of Indianapolis.

GILKISON, J.—The appellee, Frank P. Huse, Treasurer of Marion County, Indiana, is sued as ex-officio City Treasurer of the City of Indianapolis, Indiana. Appellee, Ralph F. Moore, is sued in his official capacity as Auditor of Marion County, Indiana. Appellee, Dean S. Tyndall is sued as executor of the last will of Robert H. Tyndall, deceased, who was mayor at the time of his death in 1947. The appellee, The City of Indianapolis, Indiana, is sued as a municipal corporation. Each of the remaining appellees is sued in his capacity as an officer of the City of Indianapolis, Indiana.

This is an equitable action by appellants as representatives of all taxpayers of the City of Indianapolis and of Marion County, Indiana, to recover for the use and benefit of said city and county, as their interests may appear, after the public authorities had refused to sue, from each of the city's 11 elective officers, any increase in salary that may have been paid them as allowed by Section 1 of Acts 1945, ch. 203, p. 668, and from the defendants Hickman and Huse as such city officials for the total amounts drawn upon the city

funds and paid out by them to or for the use of said elective officers, for the allegedly unlawful amounts so paid them, with 6% interest per annum from the date of payment. They further pray that said defendants be perpetually enjoined from paying out or receiving and converting to their own use any of the city's funds for the amounts of the increases in the respective salaries over and above the salaries fixed at the time their elective terms of office began.

Appellees' demurrer to the complaint was sustained, with judgment, from which this appeal is taken.

Section 1 of ch. 203 of the Acts of 1945, § 48-1223 Burns' 1945 Supp. became effective by emergency clause on March 6, 1945, and is as follows:

*"Be it enacted by the General Assembly of the State of Indiana,* That Section 11 of said above entitled act be amended to read as follows: Sec. 11. In cities having a population of over two hundred fifty thousand as shown by the last preceding United States census, the annual salaries for the officers herein named shall be fixed by the common council at the following amounts: Mayor, twelve thousand dollars; City Clerk, four thousand dollars; ex officio City Treasurer, sixteen hundred dollars; County Auditor for services to civil city, six hundred dollars; members of the Common Council, twelve hundred dollars; and for the president thereof and the chairman of the finance committee thereof, six hundred dollars in addition thereto. Such compensation for services to the city of the ex officio City Treasurer and County Auditor shall be paid in accordance with the provisions of the Act concerning salaries of county officials, the same being Chapter 234 of the Acts of 1941, as amended by Chapter 212 of the Acts of 1943. The salaries of all other officers, employees, deputies, assistants and department and institutional heads of such cities not named in this section but otherwise provided for by law shall be fixed in the manner provided in section 10 of this act."

The prior law fixing the salaries of the 11 elective officers, appellees herein, is Section 11, ch. 233 Acts 1933, p. 1050, 1051; § 48-1223 Burns' 1933, and reads as follows:

"In cities having a population of over two hundred fifty thousand, as shown by the last preceding United States census, the annual salaries for the officers herein named shall be fixed by the common council, as hereinafter provided, at not to exceed the following amounts: Mayor, six thousand dollars; controller, three thousand six hundred dollars; deputy controller three thousand dollars; city clerk, two thousand four hundred dollars; county treasurer ex officio city treasurer, one thousand six hundred dollars; corporation counsel, four thousand five hundred dollars; city attorney, three thousand six hundred dollars; city engineer, four thousand five hundred dollars: Provided, The salary established within the maximum herein named for the city engineer shall be in full for all services of whatsoever kind or nature, including his services as member of the board of sanitary commissioners and he shall receive no other fees, per diem· or emoluments whatsoever; president of board of public safety, two thousand five hundred dollars; two members of the board of public safety, nine hundred dollars each; president of board of· public works, three thousand dollars; two members of the board of public works, two thousand one hundred dollars each; city purchasing agent, three thousand six hundred dollars; president .of board of sanitary commissioners, three thousand dollars; one member of the board of sanitary commissioners, other than the city engineer, two thousand one hundred dollars; members of the common council, six hundred dollars each; county auditor, for service to civil city, six hundred dollars."

Section 21 ch. 233 Acts 1933, page 1055; § 48-1233 Burns' 1933, provides, so far as may be applicable to this case, that the common council of every city shall by ordinance duly enacted on or before the first Monday in September, 1933, and thereafter on or before

the first day of April of the year in which elections for city officers are held, fix the annual salaries of all officers provided for in this act at not exceeding the amounts herein specified, and such salaries when so fixed for such officers shall not be changed during their respective terms of office. The salaries of appellee elective officers were fixed by the Common Council of Indianapolis, by ordinance pursuant to § 48-1223, *supra,* during March, 1942. They were not fixed by statute, and a question is presented whether they were fixed by law or only pursuant to law. This question has been recently considered by this court. See *Benton County Council* v. *State* (1946), 224 Ind. 114, 65 N. E. 2d 116, 119; Also Anno. Cases 1917-C p. 688.

By Section 1 of ch. 229, Acts 1945, page 1071, § 29-4312, Burns' 1945 Supp. sometimes called "The 2d Skip Election Law," the time for holding the election of all the elective officers of all cities in Indiana was changed from the first Tuesday after the first Monday in November, 1946, to the first Tuesday after the first Monday in November, 1947. By § 4 of the Act, § 29-4315, Burns' 1945 Supp. it is provided that the city officials to be elected under this act shall take office at twelve o'clock noon on the first day of January, 1948, and shall serve four years and until their successors are elected and qualified.

A "Skip Election Law" was enacted in 1933, Acts of 1933 ch. 173, p. 878, § 10 of that law page 881, Burns' 1933, § 29-1809, provided:

"The several city officials to be elected under the provisions of this act shall take office at twelve o'clock noon on the 1st day of January, 1935, and thereafter such city officers shall take office at twelve o'clock noon on the first day of January next following their election. Such officers shall serve for four years and until their successors are elected and qualified."

The elective officers, who are appellees in this case, were elected at the 1942 general election, took their respective offices January 1st, 1943, and the period of their term was fixed by this law. The skip election law of 1945 made it necessary that they serve an extra year from January 1, 1947, to January 1, 1948, agreeable with the statute aforenoted and with Art. 15, § 3 Indiana Constitution.

The questions presented are: (1) Is the extra year the appellee officers were required to serve a part of the term of office to which they were elected at the general election in November, 1942? (2) Does the law of Indiana (§ 49-1103 Burns' 1933) prohibit the payment to appellee officers for their services during such extra year, the additional salaries provided by Acts of 1945, § 1 ch. 203, pp. 668, 669, § 48-1223 Burns' 1945 Supp. *supra?* And (3) Art. 15, § 2 Indiana Constitution provides:

> "When the duration of any office is not provided for by this Constitution, it may be declared by law; and if not so declared, such office shall be held during the pleasure of the authority making the appointment. But the General Assembly shall not create any office the tenure of which shall be longer than four years."

A question is presented whether this section of the Constitution was amended by the voters of Indiana at the general election held November 2, 1926, by changing the period at the end thereof to a comma and adding the following: "nor shall the term of office or salary of any officer fixed by this constitution or by law be increased during the term for which such officer was elected or appointed." We shall consider these questions in the order named.

(1) So far as the appellees are concerned, a definite

and certain term of office resulted from the election of appellee, Mayor, City Clerk and each member of the common council at the 1942 General Election. By the law under which they were elected (Burns' 1933, § 29-1809, *supra*) this term is fixed at four years—from January 1st, 1943, to January 1st, 1947. To this term the Indiana Constitution appends for each a possible term "and until his successor shall have been elected and qualified." This latter term is usually referred to as a "contingent and defeasible" term—contingent, meaning something that may or may not happen, *Devin* v. *McCoy* (1911), 48 Ind. App. 379, 381, 93 N. E. 1013, and defeasible in that it is capable of being or liable to be avoided, overruled or undone; the usual way this occurs is by the expiration of the prescribed term, the legal election of a qualified successor and his qualification as such official. *Gosman* v. *State ex rel. Schumacher* (1895), 106 Ind. 203, 205, 6 N. E. 349. The definite and certain term is created by the statute aforesaid; the contingent, defeasible term is created by Art. 15, § 3 of the Constitution of Indiana, providing as follows:

"Whenever it is provided in this Constitution, or in any law which may be hereafter passed, that any officer, other than a member of the General Assembly, shall hold his office for any given term, the same shall be construed to mean, that such officer shall hold his office for such term, and until his successor shall have been elected and qualified."

It is true that the statute, § 29-1809 Burns' 1933, *supra*, after providing for the definite and certain term of four years for the city officers named, further provided that they should serve "until their successors are elected and qualified." This statement when used in a statute is but declaratory of the constitutional provision quoted. *The State ex rel. Harrison* v. *Menaugh*

(1898), 151 Ind. 260, 51 N. E. 117, 51 N. E. 357. The additional term is created by the constitution aforesaid, and the statutory provision is but a recognition thereof by the legislature. *Scott* v. *State ex rel. Gibbs* (1898), 151 Ind. 556, 559, 52 N. E. 163, and cases cited. The constitutional purpose in the creation of this contingent defeasible term is not to add more time to the four year term provided by statute, in contravention of Art. 15 § 2 Indiana Constitution, supra, but is solely to avoid a vacancy. *The State ex rel. Harrison* v. *Menaugh, supra,* page 273; *The State ex rel. Carson* v. *Harrison* (1887), 113 Ind. 434, 440, 16 N. E. 384; *Spencer* v. *Knight* (1912), 177 Ind. 564, 575, 98 N. E. 342; *Scott* v. *State ex rel. Gibbs, supra,* page 560; *State ex rel. Hogue* v. *Slack* (1928), 200 Ind. 241, 250, 251, 162 N. E. 670, 163 N. E. 21.

If we should hold that this constitutional contingent, defeasible term is a part of the statutory elective term of the officers involved, we would of necessity trespass upon Art. 15, § 2 of the Indiana Constitution. We cannot entertain the idea, that § 2 and § 3 of Art. 15, *supra,* are conflicting, but must consider that each is a part of one harmonious whole. When the elective term ends and no qualified person has been elected and qualified to take over the duties of the office, the person holding the office at the end of the elective term has a right and duty, commanded by Art. 15, § 3, *supra,* to hold the office and discharge its duties "until his successor shall have been elected and qualified." This service is not a part of his elective term, but is a constitutional term granted to avoid a vacancy—and to assure an ever-continuing government in any and every emergency. *State ex rel. Carson* v. *Harrison, supra,* page 441; *Scott* v. *State ex rel. Gibbs, supra,* page 561. Appellants' contention that the extra

year appellee officers were required to serve by reason of Acts of 1945, ch. 229, § 1, *supra*, § 29-4312, Burns' 1945 Supp. is a part of their elective terms, is therefore not well founded. However, each of these officers by holding the office at the time, was in a position to claim the contingent defeasible term when it arose, against all contenders, by virtue of the constitutional provision last quoted. *Scott* v. *State ex rel. Gibbs, supra,* page 560, 561; *Kimberlin* v. *State ex rel. Tow* (1891), 130 Ind. 120, 123, 124, 29 N. E. 773.

When the right of an officer to hold the contingent defeasible term created by the constitution as aforesaid has been attacked the courts have used rather imperative language to express the strength of the holding officer's right. Thus in *State ex rel. Harrison* v. *Menaugh, supra,* at page 273, this court said:

> "In consideration of this constitutional provision, the electors of this State, when, by their ballots, they designate a person to fill a public office the tenure of which is prescribed either by the constitution or some statute, must be presumed to understand and know that the contingent holding of the officer until his successor is elected and qualified, is as much a part of the term for which he is elected as is that which is expressly prescribed and fixed."

See also *Kimberlin* v. *State ex rel. Tow, supra; The State ex rel. Carson* v. *Harrison, supra; State ex rel. Jackson Twp.* v. *Berg* (1875), 50 Ind. 496, 501.

There are many similar expressions in the decisions of this court, and in courts of other jurisdictions. However, in considering these strong expressions regard must be had to the issue before the court in each particular case in which the expressions are used. So far as we have found in each such case there was an attack upon the right of the official to hold the office

for the contingent, defeasible term provided for by the consitution. We think in each such case it was the intention of the court to say that the right and duty of the official to hold and to serve the contingent term provided for by the constitution, is quite as imperative, well founded and impregnable, as his right and duty to serve the definite and certain term for which he was elected. We do not think it was ever the intention of the courts to blend or confound the two terms. So in *Koerner* v. *State ex rel. Judy* (1897), 148 Ind. 158, at pages 166, 167, 47 N. E. 323, this court said:

> "It is settled that all officers except members of the legislature hold their offices under the constitution for the term for which they are elected, *and until their successors are elected and qualified.* (authorities).
>
> "Under the constitution officers who are elected for a term, are thereby authorized to continue to hold and discharge the duties *and receive the emoluments of their office* until they are superseded by other persons in their places *even though that extends beyond the legal length of the term for which they were elected.* (authorities).
>
> "The policy of constitutional provisions of that nature is to prevent the happening of vacancies in office except by death, resignation, removal and the like. State, ex rel. v. Harrison, supra. As was said in the latter case at page 441: *'It adds an additional contingent and defeasible term* to the original fixed term, and excludes the possibility of a vacancy, . . . '" (Italics supplied).

See also *Scott* v. *State ex rel Gibbs, supra,* page 559, 560; *State ex rel. Jett* v. *Ives* (1906), 167 Ind. 13, 21, 78 N. E. 225; *Robinson* v. *Moser* (1931), 203 Ind. 66, 179 N. E. 270, concurring opinion of Myers, J. page 84.

(2) § 49-1103 Burns' 1933 provides:

"The salary of any officer elected to any elective township, city, county or state office in the state

of Indiana, shall not be increased during the term for which such officer was *elected,* and this act shall be construed to be a part of any law enacted for the change or increase of any such salaries." (Our emphasis).

Since each of the officers involved was not serving any part of the term for which he was elected, but on the contrary was serving, by command of the constitution, for a period beginning at the end of his elective term, January 1, 1947, and ending when "his successor shall have been elected and qualified" which in this case was January 1, 1948, the salary increase provided for by § 1, Acts 1945, ch. 203; § 48-1223 Burns' 1945 Supp. lawfully may be paid to each of them without conflicting with § 49-1103, *supra.*

(3) At the general election held on the first Tuesday after the first Monday in November, 1926, a proposed amendment to the Constitution of the State of Indiana, that had been agreed to by the seventy-third and seventy-fourth general assemblies was submitted to the voters of the state. It reads as follows:

"That section two (2) of article fifteen (XV) of the constitution of the State of Indiana be amended to read as follows: Sec. 2. When the duration of any office is not provided for by this constitution, it may be declared by law; and if not so declared, such office shall be held during the pleasure of the authority making the appointment. But the general assembly shall not create any office, the tenure of which shall be longer than four (4) years, nor shall the term of office or salary of any officer fixed by this constitution or by law be increased during the term for which such officer was elected or appointed."
Acts 1925, ch. 223, p. 625.

We take judicial notice of the facts shown by the records of the Secretary of State, that at the election there were cast in favor of the amendment 182,456

votes, against the amendment 177,748 votes, and that the total number of electors who voted at the election was 1,052,994. That the Secretary of State thereupon certified said facts to the governor, who immediately issued his proclamation accordingly and declared that the amendment had been rejected. *The State* v. *Swift* (1880), 69 Ind. 505, 509.

Art. 16, § 1, of the Constitution of Indiana, provides the method for the amendment of the Constitution as follows:

> "Any amendment or amendments to this Constitution, may be proposed in either branch of the General Assembly; and, if the same shall be agreed to by a majority of the members elected to each of the two Houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the General Assembly to be chosen at the next general election; and if, in the General Assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each House, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution."

The mechanics for the submission of a proposed amendment to the electors of the State is not provided for by the Constitution. On the contrary the Constitution makes it "the duty of the General Assembly" to provide the method for the submission of a proposed amendment. This was done in the matter of this proposed amendment by Acts 1925, ch. 127, *supra,* and the plan was fully carried out. The last act required was fully performed after the tabulation of the vote, by the proclamation of the Governor on December 21, 1926. There is no doubt that at that time it had been

the consistent holding of this court since the adoption of the present constitution in 1851, that a proposed amendment to the state constitution could become effective only *if a majority of the electors of the state* should ratify the same, as provided by Art. 16, § 1, of the Indiana Constitution, supra. The decisions of this court relative thereto are found in *State* v. *Swift, supra; In re Denny* (1901), 156 Ind. 104, 106, *et seq.*, 59 N. E. 359, and *In re Boswell* (1913), 179 Ind. 292, 295, *et seq.*, 100 N. E. 833. It is therefore apparent that the proclamation of the governor issued December 21, 1926, showing that the proposed amendment had failed in the 1926 general election by the vote hereinbefore stated, was in all things agreeable with the law as it then existed in the state of Indiana. The matter has remained undisturbed and apparently conclusively at rest for more than twenty-one years. The principles upon which it was determined, had been definitely adjudicated by the three cases last cited, and was the accepted law since the date of the adoption of the present State Constitution.

By the majority opinion in the case of *In re. Todd,* (January 29, 1935) 208 Ind. 168, 193 N. E. 865, this court changed the long prevailing rule and determined that a majority of the votes cast for or against the proposed amendment, and not a "majority of the electors of the state" should determine whether the proposed amendment was or was not adopted. Without either approving or disapproving the majority opinion *In re. Todd,* we recognize that it is the law of that case and that from the date of the filing of the opinion, it became the law of Indiana with respect to the adoption of amendments to the state constitution and that it will remain the law on that subject until it may be modified or overruled by this court.

It is appellant's contention that the majority opinion *In re. Todd* has a retrospective effect, extending back to the date of the adoption of the present state constitution, and therefore is controlling in the matter of the amendment in question, voted upon by the electors of the state at the general election held in November, 1926, more than eight years before the *In re. Todd* decision.

With respect to the question thus presented Blackstone, the eminent law commentator says:

> "It is an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scales of justice even and steady, and not liable to waver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from according to his private sentiments; he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one."

1 Blackstone Com. p. 69, quoted in *Hasket* v. *Maxey* (1892), 134 Ind. 182, 188, 33 N. E. 358.

In the matter of the legal effect of overruling cases that place a construction upon a statute, this court has said:

> "The construction now placed upon this statute should be deemed correct, but as to the wisdom of overruling a line of decisions which had been steadily adhered to for the period of twenty-three years, we have nothing to say further than to remark that stability in the decisions of a court of last resort is greatly to be desired. To overrule precedents, which have become recognized rules of property, and the basis of contract relations, unsettles titles,

disturbs business transactions *and introduces an element of uncertainty into the administration of justice from which the public suffers great inconvenience.* As was said in Rockhill v. Nelson, supra (1865, 24 Ind. 422, 424), 'There are some questions in law, the final settlement of which is vastly more important than how they are settled' ''; (Our italics).

*Haskett v. Maxey, supra.*

While the general rule may be that the court ■ was mistaken and the law is and always has been as expounded in the last decision, there is a well established exception.

"This exception is that, 'After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effects on contracts as an amendment of the law by means of legislative enactment.' ''

*Haskett v. Maxey, supra,* p. 191.

The court then says that such change in construction should be made prospective, but not retroactive. See *Douglass v. Pike County* (1879), 101 U. S. 677, 25 L. ed. 968, 971; *Stephenson v. Boody* (1894), 139 Ind. 60, 66, 38 N. E. 331; *Burget v. Merritt* (1900), 155 Ind. 143, 147, 57 N. E. 714. See also *Selected Writings of Benjamin Nathan Cardozo* page 170. Dissenting opinion of Mr. J. Holmes, concurred in by J. J. White and McKenna. *Kuhn v. Fairmount Coal Co.* (1909), 215 U. S. 349, 370, 54 L. ed. 228. *Gelpcke v. Dubuque* (1863), 1 Wall. 175, 68 U. S. 175, 17 L. ed., 520, 525.

The holding of the courts with reference to the legal effect of a change in the judicial construction of a

statute should throw some light upon the legal effect of a change in the judicial construction of the constitution. A text writer has said:

> "The presumption that statutory enactments are not to be considered retrospective in their operation unless the intention so to make them clearly appears from their terms has application as well to constitutional provisions. The general rule is that prospective effect alone is given to provisions of state Constitutions, . . ."
>
> 11 Am. Jur., *Constitutional Law,* § 35, p. 641.

In an exhaustive review of the authorities on the subject of "The Protection Afforded Against The Retroactive Operation of an Overruled Decision" in 18 Columbia Law Review (1918), page 230, in summarizing, the author among other things said on page 251:

> "From the above results it is not too much to say that ultimately, where the courts feel impelled to abandon a position formerly taken, all rights will be protected against the retroactive effect of the overruling decision, *and the people may rely upon the court decisions as announcing the law by which they are to be governed.* True, it may like a statute, be repealed, *but the repealing decision will, like the repealing statute, operate prospectively only."* (Our italics).

Writing on this subject Justice Cardozo of the New York Court of Appeals, and the United States Supreme Court, says:

> "I say, therefore, that in the vast majority of cases the retrospective effect of judge-made law is felt either to involve no hardship or only such hardship as is inevitable where no rule has been declared. I think it is significant that when the hardship is felt to be too great or to be unnecessary, retrospective operation is withheld. Take the cases where a court of final appeal has declared a statute void, and afterwards, reversing itself, declares the

statute valid. Intervening transactions have been governed by the first decision. What shall be said of the validity of such transactions when the decision is overruled? Most courts in a spirit of realism have held that the operation of the statute has been suspended in the interval. It may be hard to square such a ruling with abstract dogmas and definitions. When so much else that a court does, is done with retroactive force, why draw the line here? The answer is, I think, that the line is drawn here, because the injustice and oppression of a refusal to draw it would be so great as to be intolerable. We will not help out the man who has trusted to the judgment of some inferior court. In his case, the chance of miscalculation is felt to be a fair risk of the game of life, not different in degree from the risk of any other misconception of right or duty. He knows that he has taken a chance, which caution often might have avoided. The judgment of a court of final appeal is felt to stand upon a different basis."

*Selected Writings of Benjamin Nathan Cardozo,* p. 170.

See also dissenting opinion of Mr. Justice Brandeis concurred in by J. J. Roberts and Cardozo (1931), 285 U. S. 393, 405, 76 L. Ed. 815, 823.

Since the opinion *In re. Todd* changed the method of ascertaining the majority vote cast in elections held on the presentation of a proposed Constitutional amendment, from what it had been for a period of some 83 years last prior to the decision, it in substance amounted to a change in the Constitution itself with reference to this particular matter, and it certainly should have no retrospective effect. To give it that effect would introduce a commanding element of uncertainty amounting to utter chaos and confusion as to what the fundamental law of the state now is and what it has been during the ninety-six years last past, since the adoption of the present constitution. It is never the intention of the courts to produce such

an uncertainty and we do not believe such an intention should be read into the *In re. Todd* opinion. On the contrary the controlling purpose behind our constitutions, statutes and court decisions is to produce an orderly, consistent, growing system of government of, for and by all the people, and so clear and definite that all may know the law at all times. So believing we hold that the law as stated in the *Swift, Denny* and *Boswell* cases *supra,* constituted the law with reference to the method of ascertaining the majority vote on proposed amendments to the constitution up to the date of the general election of 1932. Our state government has proceeded legally and orderly in the matter of the several amendments that have been proposed to the State Constitution and submitted to the voters for their approval or disapproval since its adoption in 1851. The decision in the Todd case became effective on the date it was filed. It became the law with respect to the vote required to adopt a constitutional amendment in Indiana in that case and in the future, so long as it remains the law, but it has no retrospective effect. It follows, of course, that the Todd decision had no effect whatever on the proposed amendment to Art. 15, § 2, of the Indiana Constitution, voted upon by the electors of the state at the general election on the first Tuesday after the first Monday of November, 1926. The provisions of the law with respect to this election having been faithfully followed, the proclamation of the governor on December 21, 1926 that the proposed amendment was rejected, remains undisturbed.

Finding no error, the judgment is affirmed.

O'Malley, J. concurs with opinion.

Young, J. and Starr, J. concur as to part and dissent as to part, with opinion.

## CONCURRING OPINION

O'MALLEY, J.—Because of the importance of the subject and its impact upon the jurisprudence of this state, I feel the necessity of concurring in the majority opinion, and of giving some of the reasons which prompt such action.

In many of the authorities on the subject dealing with the effect of a decision which overrules a prior decision of a court of last resort, it has been said that even though the changed or new statement of the law is considered as "having always been the law," nevertheless, in each instance the court excepts vested interests from the general rule as being beyond that rule and thus protected. Vested interests include contract and property rights and also acts which are done in reliance on the announced opinion of the court of last resort. In Kent's Commentaries (14th Ed.). Vol. 1, pp. 475, 476, it is said:

> "If a decision has been made upon solumn argument and mature deliberation, the presumption is in favor of its correctness; and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it."

Is a right to have a vote counted a vested right? Did the people generally over a long period of time have the right, as a vested right, to consider that the vote on a proposed amendment would be counted under the law as then announced?

If the court in its opinion in the case of *In re Todd* (1935), 208 Ind. 168, 193 N. E. 865, had intended that their opinion would disturb the basic law back to 1852, it would not have said that the amendment was adopted in 1932. The same amendment had been sub-

mitted to the people of the state on other occasions and each time it received more votes than were cast against it.

If uncertainty is to be removed from the basic law of our state we must not permit important and privileged acts, which were proper and in accord with the decisions of this court at the time of their commission, to become illegal and wrong as a result of a later decision of this court. Should not such acts, done in faithful reliance on our decisions, be saved as exceptions to the rule that a change in decision acts retrospectively as well as prospectively? Basic rights can thus be kept secure at all times and all uncertainty will be removed. In *Ashford* v. *Prewitt* (1893), 102 Ala. 264, 273, 14 So. 663, 665, it was said in regard to the effect of a decision:

> " 'That no injustice may be done to litigants who, under the influence of the decision made in the case of *Prewitt* v. *Ashford,* 90 Ala. 294, *supra,* have instituted proceedings to procure the legal title, we declare and hold that as to such cases the case of *Prewitt* v. *Ashford* operates as a rule of property.' "

The reference was to the right and power of the court to invest a litigant with title by decree of the court. It arose because the court reversed itself and ruled that it had no such right or power.

In some jurisdictions it has been held that an act done under sanction of the construction placed upon the criminal law will not be permitted to be used as a basis for criminal action so as to make that a crime which had been declared lawful under a prior decision. *State* v. *Bell* (1904), 136 N. C. 674, 49 S. E. 163; *State* v. *Fulton* (1908), 149 N. C. 485, 63 S. E. 145; *State* v. *Longino* (1915), 109 Miss. 125, 67 So. 902. The reasoning is that although the decision is retrospective in

its effect, the law will be so construed that the prior decision controls the effect of the act.

The right to vote and to have the vote counted and tabulated and the returns made in accordance with the accepted law of the time, is to most of us just as sacred as the right of the contracting party, or the right of the person accused of crime, to have his matter determined under the law as announced at the time of the entering of the contract or the commission of the act which later was classified on the criminal side.

The evolution of the law on the subject-matter involved has been slow but steady. Its progress should not be unduly checked by the application of the maxim of the law that ignorance of the law is no excuse *(ignorantia juris non excusat)*. The maxim performs a great and useful function in most instances. However, we should not permit it to blind our sense of reality. We must at all times evaluate the harm or the good that may flow from a rigid application of the fixed formula. From such viewpoint I can see that the broadening of the exception will do much to create certainty in the basic law, a thing to be desired. Reason and necessity seem to press for a slight enlargement of the exception to that rule. It was the creation and broadening of the exception that took contract rights, property rights and other important acts out of the operation of the general rule. Its development has not been uniform in all jurisdictions, even in the United States, but each time the exception was broadened, it was thought to be a forward step for the common good. Such action in the instant case will accomplish much that is good and almost indispensable, and on the other hand, no harm will flow to the law or its institutions as a result of such enlargement. Therefore, I join in the opinion of Judge Gilkison.

STARR and YOUNG, JJ.—Concurring in part and dissenting in part:

The majority opinion is divided into three numbered parts. For the reasons stated in parts one and two, we concur in the affirmance of the judgment.

In view of the fact that the majority opinion in parts one and two decides that the term of office involved is not an elective term, it was not necessary to decide whether § 2 of Article 15 of the Constitution of Indiana was amended in 1926, and hence was not necessary to include part three therein. It having nevertheless been included, we must dissent from what is said and from the conclusions reached therein. This part involves the meaning and application of the opinion of this court in *In re Todd* (1935), 208 Ind. 168, 193 N. E. 865. In that case this court construed the provision of the Constitution of Indiana relating to its amendment and held that this provision requires that only a majority of the votes cast for any amendment be in favor to insure its adoption, regardless of the total number of voters going to the polls and voting upon that and other subjects. Prior to the decision in *In re Todd*, this court had construed the amendment provision of the Constitution of Indiana as requiring a favorable majority of all votes cast at the election at which the amendment was submitted. In reaching this conclusion in the Todd case this court overruled three cases which had established the earlier construction of the constitutional provision with reference to amendment.

The majority opinion purports to recognize the holding in *In re Todd,* but would limit its application. It would test the adoption of the amendment involved in *In re Todd* by one rule and the amendment involved

in the case before us by another rule. It seems to us that it cannot be held that the amendment involved in the case before us failed (it having received a majority of the votes cast for and against it) without overruling the *In re Todd* case, which we are unwilling to do.

The majority opinion attempts to justify this apparent inconsistency by holding that the decision in *In re Todd* was not retroactive, but established the rule laid down in that case only for the amendment involved in that case and future amendments. It seems to us the Todd case was and had to be retroactive.

The general rule is that a decision overruling a prior decision as to the construction of a statute is retroactive to the time of enactment of the statue. 21 C. J. S., *Courts*, § 194, p. 326, and cases cited in Note 79; *Center School Township* v. *State, ex rel. Board, etc.* (1898), 150 Ind. 168, 178, 49 N. E. 961; *Byrum* v. *Henderson* (1898), 151 Ind. 102, 107, 51 N. E. 94; *Addison School Twp.* v. *City of Shelbyville* (1898), 21 Ind. App. 707, 52 N. E. 105; *Fleming* v. *Fleming* (1924), 264 U. S. 29, 31, 32, 68 L. Ed. 547, 549.

The case of *Center School Township* v. *State, ex rel., supra,* presented almost the precise question which we are discussing, except that it involved the construction of a statute instead of the construction of a constitutional provision, but generally speaking, and "in the main, the general principles governing the construction of statutes apply also to the construction of constitutions." 16 C. J. S., Constitutional Law, § 15, p. 51, and cases cited in Note 35.

In the Center School Township case this court, in discussing the question now before us said, on pp. 173 and 174:

"Passing, however, to the consideration of what is regarded by the parties as the real question in issue . . . that is to say: Shall we confine the change made in the interpretation of the law by the Taggart case so as to operate prospectively only, and thereby not affect appellant in its claim to the entire surplus dog fund distributed to and received by it prior to March 21, 1895; or shall the new construction of the statute be held to be binding on it as to the money in dispute: .

"The decision of the court of last resort, the authorities assert, are not the law, but are only the evidence or exposition of what the court construes the law to be, and in overruling a former decision by a subsequent one the court does not declare the one overruled to be bad law, but that it never was the law, and the court was therefore simply mistaken in regard to the law in its former decision. The first decision, upon the point on which it is overruled, is wholly obliterated and the law as therein construed or declared must be considered as though it never existed, and that the law always has been as expounded by the last decision. *Haskett* v. *Maxey*, 134 Ind. 182; Ram's Legal Judgments, 47.

"This rule, however, is subject to the well settled doctrine that courts will not so apply a change made in the construction of the law as it was held to be in the overruled case, as to invade what is considered vested rights, or, in other words, while as a general rule, the law as expounded by the last decision operates both prospectively and retrospectively, still, courts are required to and do confine it in its operation so as not to impair vested rights, such as property rights or those resting on contracts express or implied. *Haskett* v. *Maxey, supra; Stephenson* v. *Boody*, 139 Ind. 60."

Upon the authority above cited the construction placed upon the amendment provision of the Constitution in the *In re Todd* case reaches back to the adoption of such provision and all amendments, whether submitted before or after the decision in that case, are tested by the same rule and it seems to us that the

proposed amendment of Article 15, § 2 of the Indiana Constitution voted upon in 1926 must be considered as adopted until and unless the *In re Todd* case is overruled.

When property or contract rights have become involved upon the faith of an overruled decision they will, of course, be protected notwithstanding the retroactive effect of the overruling opinion, but that does not change the general rule. The authorities cited in the majority opinion are based upon this protection idea and as we read them do not repudiate the general rule.

The case of *In re Todd* clearly points out that in overruling the three prior decisions only a question of public interest was involved and that the rule of *stare decisis* had no application which is tantamount to saying that public interest will not take the place of vested property or contract rights to stop the retroactive effect of judicial decisions which overrule earlier decisions construing statutes or constitutions.

In the case before us no vested property or contract rights are involved and no reason for not applying the general rule appears.

NOTE.—Reported in 78 N. E. 2d 535.